**J. W. BURGE, Plaintiff,**

v.

**Dale FREY, Virginia Frey, Mt. Carmel Apartments, Inc., Virdale, Inc., and Frey, Inc., Defendants.**

**No. 79 1572.**

United States District Court,
D. Kansas.

Aug. 25, 1982.

Robert J. Roth, Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiff.

William C. Farmer, Smith, Shay, Farmer & Wetta, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The plaintiff, J. W. Burge, filed a complaint seeking an accounting and recovery of damages from Dale Frey, Virginia Frey, Mt. Carmel Apartments, Inc., Virdale, Inc., and Frey, Inc. for compensation for services which he contends he performed for the defendants in the promotion and development of an apartment complex called the Mt. Carmel Apartments project. Plaintiff pleads in the alternative breach of contract, breach of fiduciary duty by the individual defendants, conversion and recovery on *quantum meruit.* Rule 8(e)(2), Fed.R.Civ.P. Plaintiff also alleges shareholder status in the now defunct Mt. Carmel Apartments, Inc. and seeks to bring a shareholders' derivative claim for an accounting against the individual defendants as former directors of Mt. Carmel Apartments, Inc. See Rule 23.-1, Fed.R.Civ.P.

This proceeding is between a citizen of Colorado and citizens of Kansas with an amount in controversy in excess of $10,000, therefore, the court's jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332 (1966).

Plaintiff claims he rendered services to the defendants and accepted stock in Mt. Carmel Apartments, Inc. as compensation. Defendants deny that plaintiff is a shareholder and join in asserting counterclaims against the plaintiff for breach of contract, for negligence and for misrepresentation.

On January 12, 1982, this case proceeded to trial on all claims before the court sitting without a jury. At the close of plaintiff's evidence, the defendants moved for a directed verdict on behalf of Virginia Frey and Frey, Inc. Rule 50(a), Fed.R.Civ.P. The motions were taken under advisement by the court and will be ruled on in conjunction with this memorandum and order. The court, having heard the testimony and arguments of counsel and having examined the voluminous documentary evidence involved in this case, makes the following findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P. We accept as proven the stipulations of the parties which appear in the pretrial order and incorporate them herein. See Pretrial Conference Order, Dk. 27.

### FINDINGS OF FACT

1. The defendant Dale Frey purchased 33⅓ acres, referred to as the Mt. Carmel property, on October 21, 1974. The land had an appraised value on May 29, 1974, of $798,000. Trial exhibit 1. The Mt. Carmel property was subsequently transferred to Virdale, Inc., a Kansas corporation wholly owned by Dale and Virginia Frey, husband and wife, on October 25, 1974.

2. Dale Frey authorized the plaintiff, J. W. Burge, a Colorado real estate broker, to find a developer for the Mt. Carmel property. Trial exhibit 5. Burge was to receive a commission if he could locate a lessor or purchaser for the property.

3. During 1975 Burge introduced Dale Frey to Paul Penner, a Denver, Colorado, contractor interested in developing the Mt. Carmel property. Trial exhibits 5 & 6. After a feasibility investigation, during which time the land was committed to Penner, the plans to develop the property were abandoned. See trial exhibit 7.

4. In February of 1976 the plaintiff proposed that he and Dale Frey jointly develop an apartment complex on the Mt. Carmel property. The parties verbally agreed that Dale Frey would contribute the Mt. Carmel property for the project and that plaintiff would act as developer of the project.

5. Neither Burge nor Dale Frey had developed an apartment complex prior to this occasion, although Burge was experienced in buying and developing commercial property and Frey was experienced in real estate investing. See trial exhibits 25 and 33.

6. A commercial loan application signed by Dale Frey and by J. W. Burge was submitted to Fidelity Investment Co., Wichita, Kansas, on or about March 31, 1976. Trial exhibit 22. At the same time, the parties signed a promissory note for $21,500 for the loan commitment fee to Fidelity Investment Co. Trial exhibit 28. J. W. Burge worked out cost estimates for the project. Trial exhibit 26. Fidelity Investment Co., through its property management division, agreed to manage the completed apartment complex. Trial exhibit 32. Although Fidelity Investment Co. declined to provide permanent financing for the project, they assisted Dale Frey and J. W. Burge by preparing and by endorsing a loan application package to present to the real estate financing division of the Metropolitan Life Insurance Co. See trial exhibits 35 & 38.

7. The Mt. Carmel project consisted of a phased-development apartment complex. Phase I was located on a 10-acre tract included within the 33⅓ acres of the Mt. Carmel property. Phase I development consisted of seven (7) buildings plus a clubhouse. The construction was brick and stucco over wood framing. See trial exhibit 49. The Mt. Carmel property was considered an excellent location for apartments because the existing stands of mature trees created a park-like atmosphere. See trial exhibit 35.

8. At all times pertinent to this litigation, Dale Frey was ready to sell or trade the Mt. Carmel property and had authorized the plaintiff to act as his agent in that regard.

9. The financing of the Mt. Carmel project was to include an interim construction loan and a permanent take-out loan. The terms of the construction loan were for short-term financing secured by the real estate and improvements. The proceeds of the permanent loan were to be used to pay off the construction loan and were to be secured by a mortgage agreement on the completed project. See trial exhibit 47. After phase I was occupied, revenue from the rental units was to be used to finance other phases of the project.

10. In general, the climate of the construction financing industry from 1973 to 1977 was one of caution. Tight money policies by construction lenders and price escalation in construction materials increased the risk of underestimating project costs.

11. Dale Frey and his attorney, Orlin Wagner, met with J. W. Burge and his attorney, Lawrence Loftus, on March 31, 1976, to discuss the terms of the agreement between Dale Frey and J. W. Burge. The terms agreed upon were set out in a letter of April 8, 1976, from Orlin Wagner to J. W. Burge. In his letter, Mr. Wagner states,

Mr. Frey is in agreement with the understanding of the undersigned, as discussed in our last conference in my office, that Mr. Frey, or his designee, shall have 75% of the corporation, that the other 25% going as follows: (a) To you at the ratio of $70/150$ths of 25%, (b) With the corporation having the option of requiring Mr. Baker [general contractor], or his corporation, to purchase $80/150$th of 25%.

Trial exhibit 32. By subsequent agreement of the parties, the share of the plaintiff was adjusted to 12½ percent. The interest in the Mt. Carmel project of J. W. Burge was compensation in lieu of a fee for time and labor spent in project development. In a letter from Fidelity Investment Co. to Metropolitan Life Insurance Co., dated April 28, 1976, the arrangement was described as follows:

Mr. Jess Burge was engaged by Dale Frey to market the 33.3 acres on a re-

gional basis to developers in the Kansas City-Denver areas. Because of the professional time and labor spent by Mr. Burge on Dale Frey's behalf, together with Mr. Burge's construction and cost consulting ability, it was agreed between Mr. Burge and Dale Frey that in lieu of a professional fee, that a 12.5% of the ownership of the subject development, would be allocated to Jess Burge.

Trial exhibit 38. The interest in the Mt. Carmel project of the contractor of 12½ percent was compensation in lieu of a general contractor's fee for construction. See trial exhibits 38 & 39. The proposed issuance of stock as compensation for personal service fees due the plaintiff and the contractor reduced the cash expense requirements of Mt. Carmel Apartments, Inc.

12. The court finds that the plaintiff performed the following services for Dale Frey and Mt. Carmel Apartments, Inc. pursuant to their agreement. Plaintiff consulted with the Denver architects of the project (trial exhibit 23); calculated construction costs for the project (trial exhibit 26); executed a loan application to Fidelity Investment Co. (trial exhibit 22); executed a promissory note to Fidelity Investment Co. (trial exhibit 28); consulted lending institutions regarding financing, including Fidelity Investment Co., Realbanc, Inc. (trial exhibit 44), and Bankamerica (trial exhibit 45) and consulted with prospective contractors for the project (see generally defendant's exhibit D).

13. The Articles of Incorporation of Mt. Carmel Apartments, Inc. were filed with the Kansas Secretary of State on April 6, 1976, and in the office of Register of Deeds of Sedgwick County, Kansas, on April 16, 1976. Trial exhibits 63 & 64. On August 18, 1976, Fidelity Investment Co. obtained a permanent loan commitment from Metropolitan Life Insurance Co. on behalf of Mt. Carmel Apartments, Inc. as the take-out lender for phase I of the project. Trial exhibit 47.

14. The Articles of Incorporation of Mt. Carmel Apartments, Inc. authorized the issuance of 10,000 shares of voting stock with a par value of $100 per share. Trial exhibit 30. On October 1, 1976, the first meeting of the incorporators of Mt. Carmel was held (trial exhibit 63), the bylaws of the corporation were adopted, id., and the first meeting of the Board of Directors was held (trial exhibit 64). Dale Frey was elected President; Virginia Frey was elected Secretary-Treasurer and J. W. Burge was elected Vice President and Director subject to qualification by acceptance. Id. The minutes reflect that the offer of Virdale, Inc. to purchase 2,000 shares of stock in exchange for the transfer of 33⅓ acres of land was accepted. Dale Frey represented both Virdale, Inc. and Mt. Carmel Apartments, Inc. Id. The stock certificate for 2,000 shares of stock with a par value of $100 per share was issued on October 1, 1976. Trial exhibit 65. On October 3, 1976, deeds transferring the real property to Mt. Carmel Apartments, Inc. were executed by Dale Frey as President of Virdale, Inc. Trial exhibits 66 & 67.

15. On October 29, 1976, a special meeting of the Board of Directors of Mt. Carmel Apartments, Inc. was called. J. W. Burge had not yet accepted a position on the Board of Directors. The minutes of the meeting state, in pertinent part:

Pursuant to the foregoing waiver of notice and call, a special meeting of the Board of Directors of said corporation was held at Wichita, Kansas, on the 29th day of October, 1976, with all of the qualified directors being present.

Thereupon, the President presided over the meeting, and there was presented to the Board of Directors the matter of the offer of J. W. Burge, or his nominee, to subscribe to 333⅓ shares of stock. Thereupon, upon motion duly made, seconded and unanimously carried, the offer was accepted for and on behalf of the corporation, and the Secretary was instructed to issue a stock certificate to J. W. Burge, or his nominee, immediately upon receipt of written instructions from Mr. Burge to the Secretary of this corporation.

Trial exhibit 75. Upon motion the following resolution was adopted:

BE IT FURTHER RESOLVED That, J. W. Burge be authorized to negotiate with a contractor for a turnkey [sic] contract for labor and materials for the construction of 7-three story apartment buildings and clubhouse . . . in an amount not to exceed $2,150,000.00, with performance and payment bond by contractor, all subject to the final approval of the Board of Directors of Mt. Carmel Apartments, Inc., to generally include the construction of what corporation commonly calls Phase I . . . .

Id. The minutes were duly executed by Dale Frey as President and attested by Virginia Frey as Secretary. Id.

16. The offer of J. W. Burge to subscribe to shares of stock in exchange for services performed by him was unconditionally accepted by the corporation and immediately thereafter, J. W. Burge became a stockholder with a 12½ percent interest equated to a $70,000 interest in Mt. Carmel Apartments, Inc. Trial exhibits 75 & 109.

17. The minutes of the October 29, 1976, meeting authorized J. W. Burge to negotiate a turn-key contract. In the usages of trade of the construction industry, a turn-key contract is an agreement to complete a construction project to the point when it is ready for occupancy and the key to the front door can be handed to the owners.

18. The plaintiff and Dale Frey met with a representative of Realbanc, Inc. in Denver, Colorado, on January 28, 1977. H. M. Wells, a prospective contractor, was also present. The purpose of the meeting was to obtain construction financing for the project. Realbanc, Inc. agreed to consider a loan application for both interim and permanent financing. The proposal was considered by Dale Frey but was rejected because a commitment fee had already been given to Metropolitan Life Insurance Co. for a permanent loan. See trial exhibits 49 at ¶ 27 & 57.

19. On November 26, 1976, H. M. Wells Construction Co. had bid $2,082,000 on phase I construction. Trial exhibit 94. On January 17, 1977, Design Systems, Inc. bid $2,200,000 on phase I construction. Trial exhibits 106 & 107. Design Systems, Inc. was owned by Paul Penner. During the Denver meeting with Realbanc, Inc. on January 28, 1977, Dale Frey personally selected H. M. Wells Construction Co. to be the general contractor on the project. Wells furnished letters from a bonding company stating that he could qualify to bond the Mt. Carmel project. See trial exhibits 51, 115, 119 & 151.

20. On January 28, 1977, J. W. Burge requested Dale Frey's confirmation of their agreement (see ¶ 11 *supra*). A handwritten memorandum was drafted by J. W. Burge and signed by Dale Frey. The memo states, in pertinent part:

Dale Frey-dba as Mt Carmel apts Inc Hereby Agrees to $700000*00* Development cost fee Due J. W. Burge acting as agent for Dale Frey & Mt Carmel apts—payable in stock of Mt Carmel equal to 12½% of the stock issued and authorized as [full or final] payment.

1/28/77

Signed:
Dale Frey

Trial exhibit 109.

21. On February 3, 1977, an official of Fidelity Investment Co. orally advised Dale Frey that Fidelity would provide interim as well as permanent financing. Dissatisfaction was expressed with the further participation of J. W. Burge in the venture. Dale Frey refused to terminate the relationship.

22. On February 22, 1977, Orlin Wagner, attorney for Mt. Carmel Apartments, Inc., wrote to Lawrence Loftus, attorney for the plaintiff, and advised him that "the only question remaining to cause issuance of the 12½% of stock is our being advised of how that stock is to be issued, whether to Jess· Burge, or some other designee." Trial exhibit 118.

23. H. M. Wells established a construction office in Wichita, Kansas, and was assisted by J. W. Burge in negotiations with subcontractors. When it became apparent that Wells was having difficulty bonding, Dale Frey, along with representatives of Fidelity and the architects broke phase I

down into separate contracts. See trial exhibits 155–63.

24. On March 1, 1977, Fidelity Investment Co. put its commitment for the construction loan in writing. Trial exhibit 124. On March 3, 1977, Frey obtained building permits from the City of Wichita. Trial exhibit 126.

25. On February 28, 1977, a special meeting of the Board of Directors of Mt. Carmel Apartments, Inc. was called. Trial exhibit 121. Although the bylaws as adopted by the corporation call for notice to be given to stockholders entitled to vote, see trial exhibit 63 at § 6, plaintiff did not receive notice of the special meeting, nor did he have actual knowledge of what transpired at the meeting until after the events which led to the abandonment of the Mt. Carmel project. The minutes of the meeting reflect that the board members voted to terminate and rescind plaintiff's election to the Board of Directors. Trial exhibit 121. J. W. Burge had actual knowledge that in order to qualify as a director, he had to formally accept the directorship.

26. The board then took up the matter of the stock issued to J. W. Burge:

Thereupon, there next came before the meeting of the Board of Directors, the offer of J. W. Burge, or his nominee, to subscribe to shares of stock, and the Board, after due discussion, determined that J. W. Burge has failed to perform agreements; that he has further failed to select his nominee; that he has been notified through his attorney, Lawrence T. Loftus, by letter from counsel of this corporation dated February 22, 1977 [see ¶ 22, supra], and that the action of this board in submitting an offer to subscribe for 333⅓ shares of common stock should be withdrawn, and upon motion duly made, seconded and carried, the offer to permit J. W. Burge, or his nominee, to subscribe to common stock of this corporation is rescinded.

Id. The board then took up the authorization of J. W. Burge to negotiate for a contract on behalf of Mt. Carmel Apartments, Inc.:

Thereupon, there was further presented to the board the matter of authorizing Mr. Burge to negotiate with a contractor for a turnkey [sic] contract for the construction of certain apartments, and the board discussed that Mr. Burge had ceased working for the interest of the corporation in any manner; that Mr. Burge had at no time since October 29, 1976, obtained any progressive negotiations, and that said corporation through its president negotiated with others in an attempt to obtain a contractor, and upon motion duly made, seconded and adopted, the board rescinds any right Mr. Burge had, or might of [sic] had, to negotiate in any way for the benefit of this corporation.

Id.

27. On May 20, 1977, H. M. Wells was still unable to obtain performance bonds which were required to close the financing with Fidelity Investment Co. Wells left the Wichita area and went back to Denver, Colorado. On May 27, 1977, H. M. Wells filed a mechanic's lien in Sedgwick County, Kansas, District Court for $28,000 for his time and labor spent in Wichita trying to get his construction company qualified and ready to build. Trial exhibit 169.

28. On May 26, 1977, Design Systems, Inc. reaffirmed its bid of January 19, 1977. See trial exhibits 107 & 171. On June 3, 1977, a contract was signed on behalf of Mt. Carmel Apartments, Inc. with Design Systems, Inc. to build phase I of the Mt. Carmel project for $2,287,000. Trial exhibit 178. The claimed mechanics lien on the project was not an obstacle to completion of the project.

29. By June, 1977, interim and permanent financing was committed (trial exhibits 124 and 47); a signed contract (trial exhibit 178) was obtained from a contractor who could provide performance bonds (see trial exhibits 54, 171 & 187); building permits were obtained (trial exhibit 126); plans and specifications for the project were finalized and approved by the permanent lender except for minor qualifications (trial exhibit 172) and construction was

ready to start. Gap costs, or soft costs are the difference between the construction loan and the permanent loan including interest, insurance, loan fees, bond premiums, legal fees, final surveys, recording fees, registration fees and closing costs. Soft costs for the Mt. Carmel project had increased significantly since early 1976, but Dale Frey had personal assets and credit to pay these costs. Everything had been accomplished in order to build phase I of the Mt. Carmel Apartments project.

30. On August 5, 1977, H. M. Wells filed suit and added a claim for $91,000 for lost profits to his mechanics lien claim and added Fidelity Investment Co. as a defendant. Trial exhibit 209. As a result, Fidelity withdraw interim financing from the project. The withdrawal of interim financing caused a default on the permanent loan commitment with Metropolitan Life Insurance Co. Immediately thereafter, the project was abandoned by Dale Frey. See trial exhibit 211. J. W. Burge did not cause the initial mechanic's lien to be filed, nor did he cause the additional claims to be filed.

31. J. W. Burge continued to attempt to find a buyer for the Mt. Carmel property unaware of the February 28, 1977, special meeting of the Board of Directors. See trial exhibits 208, 215, 217 & 220. Finally, J. W. Burge attempted to clarify his position through his attorney, who received a letter from Orlin Wagner dated November 30, 1978, which states, in pertinent part:

I apologize for the delay in responding to your letter of October 27, 1978. I have visited with Mt. Carmel Apartments, Inc. relative to the subject matter of your letter prior to answering.

I believe you are familiar with most all that has transpired between J. W. Burge and Mt. Carmel Apartments, Inc. Both you and Mr. Burge are aware that Mr. Burge originally was going to put together the construction and development of the Mt. Carmel land for an interest, which among several other matters, included acquiring a general contractor and acquiring Harry Wells represented to be eminently qualified by skill and finances.

Mr. Burge did not follow through; did not, apparently, have the desire or the ability to conclude, or assist in the commencement of any development, refused to meet, contact, pursue, or negotiate with the necessary individuals or companies, and refrained from any written commitment personally to Mt. Carmel Apartments, Inc.

Mt. Carmel Apartments, Inc. was ultimately sued, successfully defended a petition alleging $119,000.00 in damages, and the trial court found Mt. Carmel had suffered something like $475,000.00 damages, but did not grant judgment for these damages on the cross-claim. As a result, Mt. Carmel Apartments, Inc. will pursue an appeal on its cross-claim therein.

Mr. Burge's failure to perform as he agreed and represented resulted, long ago, in his defaulting from earning any interest in the project, in the opinion of Mt. Carmel Apartments, Inc. It has conferred with the undersigned to possible litigation against Mr. Burge and we have recommended such a claim not be pursued although substantial testimony seems readily available to support extensive damages.

Trial exhibit 227.

32. Mt. Carmel Apartments, Inc., by Dale Frey, President, and Virginia Frey, Secretary, conveyed the Mt. Carmel property to Virdale, Inc. by quitclaim deed dated March 29, 1978, for only nominal consideration. Trial exhibit 213. Virdale, Inc., by Dale Frey, President and Virginia Frey, Secretary, conveyed the Mt. Carmel property to Frey, Inc. as trustee by quitclaim deed dated September 28, 1978. Trial exhibit 218. By corporate warranty deed dated November 3, 1978, Frey, Inc., as trustee, by Dale Frey, President, and Orlin Wagner, Secretary, conveyed the Mt. Carmel property to a third party purchaser for $850,000. Trial exhibit 223. The plans and specifications for the Mt. Carmel Apartments were also provided with the property. The apartment complex was subsequently built according to the plans which were provided.

33. Dale Frey was president of the boards of directors of Mt. Carmel Apartments, Inc., Virdale, Inc. and Frey, Inc., as well as a major stockholder in the three corporations. See Pretrial Conference Order, Dk. 27 & trial exhibit 64. Assets of the corporations were included in personal financial statements of Dale Frey. See trial exhibits 24 & 80. Dale Frey personally guaranteed loans of the corporation. See trial exhibit 60. Funds and property were transferred at will by Dale Frey from corporation to corporation. See ¶¶ 1, 14 & 32, *supra.* Dale Frey set the policies and made the final decisions as the dominate stockholder of Mt. Carmel Apartments, Inc.

34. Virginia Frey was an officer of Mt. Carmel Apartments, Inc. but was not in a position to make decisions and did not take an active role in the day-to-day management of the corporate affairs.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and of the parties, venue is proper and all necessary parties are before the court.

2. Under the doctrine of *Erie Railroad Co. v. Thompkins,* 304 U.S. 64, 79–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188, 1195 (1938), a federal court hearing a case within the court's diversity jurisdiction applies the substantive law of the state where it is located.

In effect, the court acts as a state court and is bound by the decisions of the Kansas Supreme Court. *E.g., Commissioner v. Estate of Bosch,* 387 U.S. 456, 462, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886, 894 (1967). In the absence of authoritative decisions of the highest state court, we must look to intermediate appellate decisions, statutes and, then, persuasive authorities to determine how the highest court of the state would decide the issues. Id. 387 U.S. at 462, 87 S.Ct. at 1782–83, 18 L.Ed.2d at 893; *see, e.g., Delano v. Kitch,* 663 F.2d 990, 996 (10th Cir. 1981); *see generally* C. Wright, Law of Federal Courts § 58 (3d ed. 1976).

■ 3. The Kansas General Corporation Code, chapter 52, 1972 Kansas Session Laws 252 (current version at K.S.A. 17–6001 et seq. (1981)), provides the legal framework within which corporate existence, rights and liabilities are defined and regulated by the state. Under state law, a dissolved corporation continues in existence for three years for the purpose of defending against civil suits until any judgment, order or decree is fully executed.[1] As a prerequisite to the filing of a law suit against an officer, director or stockholder, a plaintiff must obtain a judgment against the corporation and attempt execution on the judgment prior to bringing the suit unless to do so would be impossible or useless.[2] *Kilpatrick*

1. Kan.Stat.Ann. § 17–6807 (1981) provides:
   All corporations whether they expire by their own limitation or are otherwise dissolved, including revocation or forfeiture of articles of incorporation pursuant to K.S.A. 17–6812 or 17–7510, shall be continued, nevertheless, for the term of three (3) years from such expiration or dissolution or for such longer period as the district court in its discretion shall direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized. With respect to any action, suit or proceeding begun by or against the corporation either prior to or within three (3) years after the date of its expiration or dissolution, and for the purpose of such actions, suits or proceedings, the corpo-

ration shall be continued a body corporate beyond the three-year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the district court.

2. Kan.Stat.Ann. § 17–7101 (1981) provides:
   (a) When the officers, directors or stockholders of any corporation shall be liable by the provisions of this act to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action against any one or more of them. The petition in any such action shall state the claim against the corporation and the ground on which the plaintiff expects to charge the defendants personally.
   (b) No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

*Brothers, Inc. v. Poynter*, 205 Kan. 787, 794–95, 473 P.2d 33, 40 (1970). It is not controverted that Mt. Carmel Apartments, Inc. is insolvent and would be unable to satisfy a judgment. Therefore, the court finds that plaintiff is not required to pursue a remedy against Mt. Carmel Apartments, Inc. prior to bringing suit against Dale and Virginia Frey as former directors of Mt. Carmel Apartments, Inc. See Complaint, Trial Dk. 1 at ¶ 19. All parties are properly before the court in accordance with state law.

4. The defendant, Dale Frey, promised the plaintiff $70,000 payable in 12½ per cent of the capital stock of Mt. Carmel Apartments, Inc. in exchange for the plaintiff's promise to perform services on behalf of Dale Frey and Mt. Carmel Apartments, Inc. Findings of Fact ¶ 11. The defendants seek to indirectly attack this preincorporation subscription agreement by claiming the agreement includes an express or implied-in-fact condition that the apartment complex be built prior to any duty on the part of the defendants to compensate the plaintiff. A preincorporation agreement is an agreement to form a corporation for the purpose of carrying on a business. J. Logan & A. Martin, Kansas Corporation Law & Practice § 2.06 (2d ed. 1979).

5. If a principal *specifies* the accomplishment by an agent of a particular result as a condition precedent to payment of an agreed compensation, the agent is not entitled to such agreed compensation unless he accomplishes the indicated result. *See, e.g., Wallerius v. Hare*, 194 Kan. 408, 412, 399 P.2d 543, 547 (1965); *Davidson v. Robie*, 345 Mass. 333, 187 N.E.2d 371, 375 (1955); *Barbara Oil Co. v. Patrick Petroleum Co.*, 1 Kan.App.2d 437, 439–40, 566 P.2d 389, 392–93 (1977); *Frederick A. Schmidt, Inc. v. Brock*, 97 Ohio App. 469, 127 N.E.2d 219, 221–22 (1955); Restatement (Second) of Agency § 445 comment a (1958). However, when a principal expressly promises to pay for services which he requests or permits another to perform for him as his agent, he is bound by his promise unless the parties have agreed otherwise. *See Rupf v. Mason*, 147 Kan. 703, 705, 78 P.2d 848, 850 (1938).

6. If a contract includes a series of writings, all writings that are part of the same transaction are interpreted together. *Reznik v. McKee*, 216 Kan. 659, 673, 534 P.2d 243, 256 (1975); Restatement (Second) of Contracts § 202(2) (1981). The corporate minutes of October 29, 1976, of Mt. Carmel Apartments, Inc. authorized the plaintiff to negotiate a turn-key contract. A turn-key contract is a term used in the construction trade for contracts in which the builder assumes all risks inherent in the construction of the project. *See* Black's Law Dictionary 1359 (5th ed. 1979). The parties understood the plaintiff was not the general contractor and did not assume the risk of noncompletion of the project. The record before the court does not contain any writings which *specify* the plaintiff's compensation was to be contingent upon the completion of construction of the project.

7. The possible failure of the venture was a reasonably foreseeable event given the climate of the construction financing industry at that time. The defendants could have structured the transaction to shift the risk of noncompletion of the project to the plaintiff by specifying in writing the result to be accomplished by him. This was not done. The defendants produced testimony that an oral condition precedent was agreed upon. However, the court will resolve this question against the defendants since the circumstances make it clear the plaintiff did not assume the risk of noncompletion of the project, the alleged condition was not within the plaintiff's control and enforcement of the alleged provision would result in a forfeiture by the plaintiff. *See* Restatement (Second) of Contracts § 227(1) (1981).

8. The weight of the evidence supports the memorandum of January 28, 1977, as the complete agreement between the parties. The agreement contains no express condition that the construction of the project was to be completed before the plaintiff was to receive the agreed compensation.

9. If the parties to a contract have signed a writing which they intended to be the final and exclusive statement of the terms of the agreement between them, it is completely integrated. There is no requirement of a formal writing and a handwritten memorandum containing the essential terms may be a binding and integrated contract. *H. B. Zachary Co. v. O'Brien*, 378 F.2d 423, 424 n.1 & 426 (10th Cir. 1967). When a writing is complete, the court must look within the four corners of the instrument to determine the terms of the agreement and evidence which varies those terms is not admissible. *First National Bank of Olathe v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299, 1303 (1979); *Steel v. Eagle*, 207 Kan. 146, 149, 483 P.2d 1063, 1066 (1971); *Smith v. Russ*, 184 Kan. 773, 778, 339 P.2d 286, 291 (1959). However, in order to determine in the first instance if a writing is completely integrated, the court is not restricted and should inquire into the circumstances surrounding the transaction, including the words and actions of the parties. *See Martin v. Edwards*, 219 Kan. 466, 474, 548 P.2d 779, 786 (1976); *Allen v. Bowling*, 173 Kan. 485, 490, 249 P.2d 679, 682 (1952); *Amortibank Investment Co. v. Jehan*, 220 Kan. 33, 43, 551 P.2d 918, 926 (1976); J. Murray, Contracts § 106 (2d rev. ed. 1974).

10. The memorandum of January 28, 1977, was handwritten by the plaintiff and signed by the defendant, Dale Frey. Its authenticity was stipulated by the parties. *See* Pretrial Conference Order Dk. 27 at ¶ H. It is a memorialization of the agreed compensation for services between the plaintiff and the defendants, Dale Frey and Mt. Carmel Apartments, Inc. While the specific services are not described, the contract is not so indefinite that it cannot be enforced. *See, e.g., Augusta Bank & Trust Co. v. Broomfield*, 231 Kan. 52, 643 P.2d 100, 107 (1982); *Care Display, Inc. v. Didde-Glaser, Inc.*, 225 Kan. 232, 236, 589 P.2d 599, 604 (1979); *Storts v. Martin E. Eby Construction Co.*, 217 Kan. 34, Syl. ¶ 2, 535 P.2d 908, Syl. ¶ 2 (1975); *Hays v. Underwood*, 196 Kan. 265, 268, 411 P.2d 717, 721 (1966). The evidence discloses that services were performed by the plaintiff to the apparent satisfaction of Dale Frey prior to the execution of the memorandum. After a careful examination of the record, the court finds the memorandum of January 28, 1977, was intended by the parties as a complete integration of their agreement.

11. The court finds that the completion of construction of the project was not an essential term to the agreement of January 28, 1977. In the absence of fraud, mistake or duress, parties may make contracts on their own terms without judicial interference. *Squires v. Woodbury*, 5 Kan. App.2d 596, 621 P.2d 443 (1980). An event may be made a condition of a contract either by agreement of the parties or by a term supplied by the court. *E.g., Sykes v. Perry*, 162 Kan. 365, 372–74, 176 P.2d 579, 585 (1947); *see also* Restatement (Second) of Contracts § 226 comment c (1981). When a written instrument is complete, the court will not imply an additional term. *Ryder Truck Rental, Inc. v. Central Packing Co.*, 341 F.2d 321, 323 (10th Cir. 1965) (applying Kansas law); *Duvenal v. Sinclair Refining Co.*, 170 Kan. 483, 488–89, 227 P.2d 88, 92, 23 A.L.R.2d 649 (1951).

12. The defendants contend the term "development cost fee" contained in the memorandum of January 28, 1977, signifies that plaintiff's compensation was contingent upon the completion of the project. Based upon the evidence presented, the court is not persuaded this term has a special meaning. *See Duffin v. Patrick*, 212 Kan. 772, 778, 512 P.2d 442, 444, 448 (1973). The defendant bargained for the services of the plaintiff as developer of the project. Developer is a general term which the parties understood meant cost consulting and construction contracting. The ordinary meaning of fee is fixed compensation for services rendered. *See* Black's Law Dictionary 553 (5th ed. 1979). Thus, "development cost fee" meant fixed compensation for services in cost consulting and contracting.

13. The defendants contend the plaintiff did not give valid consideration for

the issuance of capital stock in Mt. Carmel Apartments, Inc. The precise issue presented is whether preincorporation services are valid consideration for the issuance of capital stock in a corporation. Under the laws of the state of Kansas, the types of consideration which may be accepted by a corporation in exchange for its capital stock are controlled by Kan.Stat.Ann. § 17–6402 (1981).

> Subscriptions to, or the purchase price of, the capital stock of any corporation organized under any law of this state may be paid for, wholly or partly, by cash, or *labor done*, by personal property, or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this act. *In the absence of actual fraud in the transaction, the judgment of the directors shall be conclusive as to the value of such labor, property, real estate or leases thereof.* (emphasis added)

Id. It appears beyond doubt from the plain meaning of labor done that a Kansas corporation is authorized to accept labor or services in exchange for its capital stock. Labor done is not statutorily defined and no Kansas cases have been found which construe this language. The Kansas statute is modeled upon a similarly worded statute of the Delaware General Corporation Law, title 8, §§ 101–398 (1975).[3] In the absence of authoritative decisions from this jurisdiction, the court will give weight to decisions of the Delaware courts. *See* Kan.Corp. Code Ann. *Preface* at *v* (Vernon 1975) (suggesting this comparison).

██ 14. When a statute recognizes a subscription may be paid for by labor done, courts have held the services must have been performed prior to the issuance of stock. *Champion v. Commissioner,* 303 F.2d 887, 891 (5th Cir. 1962); *Maclary v. Pleasant Hills, Inc.,* 35 Del.Ch. 39, 109 A.2d 830, 834–35 (1954); *Rice & Hutchins, Inc. v. Triplex Shoe Co.,* 16 Del.Ch. 298, 147 A. 317, 320 (1929), *aff'd,* 17 Del.Ch. 356, 152 A. 342, 349 (1930); *Scully v. Automobile Finance Co.,* 12 Del.Ch. 174, 109 A. 49, 51 (1920); *Finch v. Warrior Cement Corp.,* 16 Del.Ch. 44, 141 A. 54, 61 (1928); *John W. Cooney Co. v. Arlington Hotel Co.,* 11 Del.Ch. 286, 101 A. 879, 888 (1917), *modified on other grounds,* 11 Del.Ch. 430, 106 A. 39 (1918). It is generally recognized that future services are not valid consideration for the issuance of fully paid stock. 11 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5187; 18 C.J.S. *Corporations* § 241e (1939). Early Delaware cases rejected preincorporation services as valid consideration for the issuance of capital stock. *See, e.g., Rice & Hutchins, Inc. v. Triplex Shoe Co., supra; John W. Cooney Co. v. Arlington Hotel Co., supra.* These cases have been overruled *sub silentio* and the prevailing view of the Delaware courts is that preincorporation services may be valid consideration for the issuance of capital stock if the underlying agreement is adopted by the corporation. *Blish v. Thompson Automatic Arms Corp.,* 30 Del.Ch. 538, 64 A.2d 581, 595 (1948); *Shore v. Union Drug Co.,* 18 Del.Ch. 74, 156 A. 204 (Del.Ch.1931).

> Services rendered and money paid constitute a good consideration for the issuance of stock of a corporation organized under Delaware law. If consideration, lawful in quality, is laid out in behalf of a proposed corporation by its promoters before its actual existence, it is competent for the corporation, under proper circumstances, to adopt the contract made by

---

**3.** Del.Code Ann. Tit. 8, § 152 (1975) provides:

Subscriptions to, or the purchase price of, the capital stock of any corporation organized under any law of this State may be paid for, wholly or partly, by cash, by labor done, by personal property, or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this chapter. In the absence of actual fraud in the transaction, the judgment of the directors, as to the value of such labor, property, real estate or leases thereof, shall be conclusive.

This statute is no longer in force in Delaware. The current version is found at Del.Code Ann. Tit. 8, § 152 (Supp.1980).

the promoters that payment therefor should be in stock and issue its stock in consideration of the services thus rendered and the money thus spent in its behalf . . . .

Id. 156 A. at 206. *See also* 11 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5210 (1971). The vote of a board of directors to accept services in exchange for capital stock is an express adoption of a preincorporation subscription agreement. *United German Silver Co. v. Bronson*, 92 Conn. 266, 102 A. 647, 648 (1917).

Interpretive regulations by state departments charged with the duty of administering and enforcing a statute have great weight in determining the application of the statute. *Cities Service Gas Co. v. State Corporation Commission*, 192 Kan. 707, 714, 391 P.2d 74, 79–80 (1964). The Securities Commissioner of the State of Kansas regulates the issuance of stock to promoters as compensation by enforcing disclosure requirements and by requiring deposit of the securities in an escrow account.[4] Kan.Adm.Reg. 81–7–1 (1978); *see* J. Logan and A. Martin, Kansas Corporation Law & Practice § 7.03 (2d ed. 1979). Thus, the state of Kansas recognizes, in principle, that promoters may be compensated in capital stock for services or property transferred to the corporation. If the Kansas Supreme Court were to decide the issue facing this court, we predict it would construe labor done to include preincorporation services which have been adopted by the corporation. In applying the statute to this case, the court notes that the Board of Directors of Mt. Carmel Apartments, Inc. voted unanimously to accept the plaintiff's offer to subscribe for shares of stock with complete knowledge of the preincorporation

agreement between the plaintiff and Dale Frey and of the services which the plaintiff had performed. Therefore, the court finds that the preincorporation services of the plaintiff were valid consideration for the issuance of capital stock of Mt. Carmel Apartments, Inc.

15. The defendants next contend that the value of the services performed by the plaintiff was grossly disproportionate to the claimed compensation. The plaintiff argues the defendants are estopped by the provision of Kan.Stat.Ann. § 17–6402 (1981), *supra*, which makes the judgment of the directors conclusive in the absence of actual fraud. The Kansas General Corporation Code adopted the "good faith" valuation provision of the Delaware Corporation Code.[5] This provision does not require the directors to determine the actual or true value of property or services, rather the rule recognizes that opinions may differ regarding the value of property or services, and makes the judgment of the directors conclusive if it is made in good faith. See 11 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5214.1 (1971 & Supp.1981) and cases cited therein. We do not think this rule applies to the case at bar because the good faith of the directors in valuing the plaintiff's services is not at issue. *Cf. Mountain Iron & Supply Co. v. Jones*, 201 Kan. 401, 411, 441 P.2d 795, 802 (1968) (creditors of corporation must prove actual fraud in order to hold stockholders liable for watered stock). The defendants seek to impeach the issuance of stock by showing that the consideration given by the plaintiff was so disproportionate to the value of the stock issued as to lead inevitably to the conclusion that the plaintiff perpe-

4. It appears that the transaction at issue in this case is exempt from regulation because it involves an issue of stock of a domestic corporation to less than 15 incorporators, Kan.Stat. Ann. § 17–1262(h) (1981), or it is a sale by a domestic corporation to not more than 15 persons within 12 months, Kan.Stat.Ann. § 17–1262(m) (1981).

5. Del.Code Ann. Tit. 8, § 152 (revised 1974) and Kan.Stat.Ann. § 17–6402 (1981) make the judgment of the directors conclusive in the ab-

sence of actual fraud. A negligent overvaluation of services made in good faith is not "actual fraud" within the meaning of the statutes. MODEL BUSINESS CORP. ACT § 19 (1971). The statutes focus on the issue of good faith rather than focusing on the equivalency of the exchange of services or property for stock. However, if the value of consideration approaches zero, the contract fails regardless of the intent of the parties.

trated a fraud. *Cf. Lewis v. Scotten Dillon Co.*, 306 A.2d 755, 757 (1973); *Shepard v. Dick*, 203 Kan. 164, 169, 453 P.2d 134, 138–39 (1969). The court will not set aside an otherwise valid exchange of stock for services based on the evidence presented. The court is not convinced that the value of $70,000 which was placed on the services performed by the plaintiff was excessive. Fraud was not established by the defendants during the course of the trial.

16. All facts pertaining to the exchange of services for stock were known to the parties to the transaction. The directors of Mt. Carmel Apartments, Inc. could not have been deceived or defrauded by the plaintiff. The corporation accepted the services of the plaintiff and lawfully issued fully paid shares of its authorized common stock as compensation. The record evidence indicates the stockholders and directors formally approved and adopted the transaction with complete knowledge of the services performed by the plaintiff. The shares were issued as fully paid and since no rights of creditors or stock purchasers were involved, the corporation was bound. *See Scovill v. Thayer*, 105 U.S. 143, 154, 26 L.Ed. 968, 973 (1881); *Blish v. Thompson Automatic Arms Corp., supra*, 64 A.2d at 604; *see also Walburn v. Chenault*, 43 Kan. 352, 363, 23 P. 657, 661 (1890) (while an agreement to exchange property for stock stands unimpeached by proof of fraud, the court will treat that as payment which the parties have agreed should be payment); Annot., 56 A.L.R. 396 (1928) (right of corporation to complain about overvalued stock).

17. The status of stockholder in a corporation is not dependent upon the issuance of a stock certificate which is only evidence of stock ownership. *See Hunt v. Eddy*, 150 Kan. 1, 13, 90 P.2d 747, 754 (1939); *Culp v. Mulvane*, 66 Kan. 143, 71 P. 273 (1903).

The stock in a corporation is personal estate. The stock is something apart from the certificates. These but evidence a fact which otherwise exists. They are but paper representations of an incorporeal right, and, as such, resemble other muniments of title. The right of stock may exist entirely separately and independently of the certificates.

Id. at 151–52, 71 P. 276. *See also Dickinson County Hospital Co. v. Kessinger*, 128 Kan. 576, Syl ¶ 2, 279 P. 7, Syl ¶ 2 (1929) (delivery of stock certificate is not necessary to perfect a subscription agreement). The fact that a stockholder failed to notify a corporation whether to issue a certificate to him or to his nominee will not defeat stockholder status when the record evidence discloses the directors voted unanimously to accept the stock subscription offer on behalf of the corporation. The court finds the plaintiff became a stockholder in Mt. Carmel Apartments, Inc. upon the acceptance by the corporation of the stock subscription offer.

18. The attempt of the Board of Directors of Mt. Carmel Apartments, Inc. to unilaterally rescind its subscription agreement with the plaintiff on February 28, 1977, is void and of no effect. There is no provision in the Kansas General Corporation Code which would empower the directors to revoke acceptance of a valid subscription agreement absent the consent or acquiescence of the subscriber. A corporation is not authorized to forfeit shares of stock unless the stockholder is in default of payment and the power is exercised in strict compliance with statutes requiring notice to the stockholder. *See Jent v. Friggeri*, 141 Kan. 144, 145, 40 P.2d 343, 343–44 (1935) (construing predecessor statute to Kan.Stat. Ann. §§ 17–6413 & –6414); Kan.Stat.Ann. § 17–6413 (1981) (rights of directors for stock not paid in full); Kan.Stat.Ann. § 17–6414 (1981) (remedies for stock not paid in full).

19. The court finds that Dale Frey violated his fiduciary duty of good faith and fair dealing by knowingly and intentionally revoking the corporation's acceptance of the stock subscription agreement of the plaintiff and by transferring assets of Mt. Carmel Apartments, Inc. for his personal benefit without receiving equivalent consideration in disregard of the plaintiff's interest. *See Newton v. Hornblower, Inc.* 224 Kan. 506, Syl ¶ 8, 582 P.2d 1136 (1978). The

court finds that Dale Frey used Mt. Carmel Apartments, Inc. as an instrumentality to conduct his personal business. See Findings of Fact ¶ 33. Under the doctrine of alter ego, the court will disregard the corporate entity and hold the individual responsible for his acts knowingly and intentionally done in the name of the corporation.[6] *Kirk v. H. G. P. Corporation, Inc.*, 208 Kan. 777, 780, 494 P.2d 1087, 1090–91 (1972); *Kilpatrick Brothers, Inc. v. Poynter, supra.* The court finds Dale Frey is personally liable to the plaintiff in the amount of $70,000. The finding of individual liability precludes consideration of plaintiff's other theories of liability.

20. The court finds the evidence as to the liability of Virginia Frey and Frey, Inc. is insufficient and grants the motions for directed verdict in favor of these defendants.

21. Based upon the evidence presented, the court finds in favor of the defendant, Virdale, Inc., and plaintiff is entitled to take nothing by his claim against this defendant.

22. Based upon the evidence presented the court finds in favor of the plaintiff and against the defendants on defendants' counterclaims for breach of contract, for negligence and for misrepresentation.

IT IS THEREFORE ORDERED that judgment will be entered in favor of the plaintiff and against the defendants, Dale Frey and Mt. Carmel Apartments, Inc., in the amount of seventy thousand dollars ($70,000) plus the costs of the action.

IT IS FURTHER ORDERED that judgment will be entered in favor of Virdale, Inc. on plaintiff's claims against it.

IT IS FURTHER ORDERED that a judgment of dismissal will be entered in favor of the defendants Virginia Frey and Frey, Inc.

IT IS FURTHER ORDERED that judgment will be entered in favor of the plaintiff and against the defendants upon defendants' counterclaims.

---

**6.** A corporation and its stockholders are presumed separate and distinct. *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, Syl ¶ 5, 624 P.2d 952 (1981). The power to pierce the corporate veil should be exercised reluctantly and cautiously. *Amoco Chemicals Corp. v. Bach*, 222 Kan. 589, Syl ¶ 3, 567 P.2d 1337, (1977). The Kansas Supreme Court has identified eight guideposts to aid the court in determining when the corporate entity should be disregarded and liability fastened upon an individual director: undercapitalization, failure to observe corporate formalities, nonpayment of dividends, siphoning of corporate assets, nonfunctioning of officers, absence of corporate records, use of corporate form as an instrument to conduct personal business and use of corporate form to promote injustice or fraud. *Amoco Chemicals Corp. v. Bach, supra,* at 594, 567 P.2d 1341–42. *See* Findings of Fact ¶ 33. When a corporate debt has been personally guaranteed or the corporation is the alter ego of the majority stockholder, the corporate form will be disregarded. *Ramsey v. Adams*, 4 Kan.App.2d 184, 185, 603 P.2d 1025, 1026 (1980).