**Robert L. KENYON, d/b/a Farmer Bob Lawn Service, Plaintiff,**

v.

**Robert N. JENNINGS, Roy P. Johnston, and The City of Wichita, Kansas, Defendants.**

**Civ. A. No. 81–1601.**

United States District Court, D. Kansas.

April 13, 1983.

Alan L. Rupe, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for plaintiff.

John Dekker, Bernard V. Borst, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This is, in theory, a fairly simple civil rights case in which the plaintiff, Robert Kenyon, seeks to recover actual and punitive damages allegedly arising from a violation of Kenyon's civil rights by the defendants; Robert Jennings, Roy Johnston, and the City of Wichita [the City]. Kenyon, Jennings, and Johnston are all Kansas residents, and jurisdiction over the case is predicated on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). Jennings and Johnston are both employed by the City. Johnston is the Director of the City's Flood Control and Landfill Division of the Department of Operations and Maintenance. Jennings is a Stream Maintenance Supervisor in the Flood Control and Landfill Division, and is supervised by Johnston.

The cancer-like proliferation of briefs in this case was started, innocently enough, when the defendants denied that this Court had jurisdiction over the parties and the subject matter in their answers to the original complaint. Few answers arrive here that do not contain such boilerplate denials. Leave that as it may, the denials apparently struck a responsive chord for Kenyon. Instead of awaiting the traditional motion to dismiss for lack of jurisdiction that is usually forthcoming from defendants who believe the assertion to have some real substance, Kenyon decided to beat the defendants to the punch, and filed a motion for partial summary judgment on the issue of jurisdiction, supported by a scholarly twenty-page memorandum brief and a five-page enumeration of uncontroverted facts.

Not to be outdone, the defendants replied to Kenyon's motion with a motion for summary judgment of their own, supported by a forty-two page memorandum brief sporting ten pages of attachments. It took the plaintiff another twenty-eight pages to respond to this, and the defendants another twenty to reply to the plaintiff's response. Unfortunately, in their zeal to argue their

conflicting theories of jurisdiction and of the merits of the dispute, the parties have, for the most part, completely ignored each other's statements of uncontroverted material facts, numbering thirty paragraphs for the defendants and thirty-four for the plaintiff. Pursuant to Local Rule 15(c) of the Rules of Practice of the United States District Court for the District of Kansas, these statements must be deemed admitted for the purposes of the pending summary judgment motions to the extent they have not been expressly controverted. The following factual recital draws on these statements to the extent the Court perceives a need for them in the disposition of the case.

## I. Factual Background

On May 5, 1981, the City, through its Purchasing Manager, G.D. Anderton, entered into a contract with Kenyon. Pursuant to the contract, Kenyon's business, Farmer Bob Lawn Service, was to provide the City the service of mowing private properties in exchange for the consideration of $18.95 for each hour of service rendered. The contract consists of a letter agreement, a completed "request for quotation" form, and four pages of specifications. On June 30, 1981, Anderton and Kenyon amended the contract to provide for remuneration at the rate of $5.50 per hour for handcutting. The contract is not ambiguous.

Inasmuch as the contract is a part of the record before the Court and neither party claims that the contract resulted from fraud or mistake, or that the contract is ambiguous, the determination of the rights and liabilities created by that document involves only questions of law to be answered by the Court, see, e.g., Burge v. Frey, 545 F.Supp. 1160, 1170 (D.Kan.1982) and cases cited therein; Williams v. Safeway Stores, Inc., 198 Kan. 331, 424 P.2d 541 (1967). Even a casual examination of the contract shows that it created only three rights for Kenyon: (a) the right to be assigned all mowing jobs that the City determined to assign to an independent contractor, as opposed to completing with its own employees; (b) the right to be compensated $18.95 for every hour of machine, and $5.50 for every hour of handcutting; and (c) the right to ten days' written notice of termination of the contract by the City for any failure on Kenyon's part to fulfill his obligations or comply with the covenants of the contract. The contract neither promises nor guarantees that Kenyon would receive any work assignments, or any particular number of work assignments.

On July 9, 1981, Kenyon's daughter went to the City Yard to pick up mowing assignments. Precisely what transpired is unclear. Gayle McDermed, the Weed Mowing Supervisor, was the person who talked to Kenyon's daughter. McDermed claims that he told Kenyon's daughter that he had been instructed to give Kenyon "no further work at this time." Kenyon's daughter claims that McDermed told her he had been instructed to "cut out the mowing." In any event, Kenyon claims that he was told by his daughter "that the City had cancelled the contract." The reason for the cessation of mowing assignments was the determination by Robert Vinson, Assistant to the Director of Operations and Maintenance, that no money was available to pay an independent contractor for mowing services. Vinson relayed this determination to Johnston, and Johnston determined, sometime between July 1 and July 3, 1981, to cease assigning work to Kenyon pending a budget evaluation. Johnston relayed the cessation order to Jennings, who relayed it to McDermed, who passed it on to Kenyon's daughter on July 9, 1981.

Neither Jennings nor Johnston intended to terminate Kenyon's contract, and no written notice of termination was ever given to Kenyon. Kenyon did receive some mowing assignments prior to July 9, 1981, which he satisfactorily completed and for which he was paid in full. No work assignments were given to any other private contractor after July 9, 1981.

Kenyon filed the complaint in this case on October 30, 1981, alleging, inter alia, that his civil rights had been violated by the cancellation of his contract without his having received written notice ten days prior to

the cancellation. As a second count, Kenyon set out a pendent state law claim of simple breach of contract. In subsequent documents, Kenyon fleshes out the skeletal assertions in his complaint by alleging that the cancellation of the contract deprived him of property without due process of law within the meaning of the Fourteenth Amendment to the United States Constitution, and that this deprivation was accomplished by Johnston and Jennings while acting "under color of" state law for the purposes of 42 U.S.C. § 1983.

## II. Analysis of the Claim

█ It is hornbook law that a well-pleaded complaint under § 1983 must allege that the plaintiff was deprived of rights secured by the Constitution or laws of the United States and that the defendant accomplished this deprivation while acting under color of state law. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). When the plaintiff claims that rights secured by the Fourteenth Amendment were trampled, the plaintiff carries the burden of proving that the state deprived him of a life, liberty, or property interest without due process of law.

█ Kenyon's claim founders in the attempt to allege a violation of the Fourteenth Amendment by these defendants on the facts of this case. Obviously, no life or liberty interest is implicated. The determinative questions thus become whether the rights created by and embodied in the contract in favor of Kenyon constituted "property" capable of constitutional protection, and, if they did, whether the "deprivation" of them by the purported cancellation was "without due process of law." This Court cannot perceive any constitutionally protected property interest held by Kenyon in this contract.

An analogy to the concept of an illusory promise is helpful in assessing the scope of Kenyon's rights under the contract. An illusory promise is "a purported promise that actually promises nothing because it leaves to the speaker the choice of performance or nonperformance," *Black's Law Dictionary* at 674 (5th Ed.1979). The promises by the City in its contract with Kenyon are perilously close to being illusory. Kenyon is promised no work, and the choice of whether he receives any work at all is one reserved to the City. The promises are not completely illusory inasmuch as the City promised to assign whatever work it chose to assign to Kenyon and not to another independent contractor, but the City was free to choose to not assign *any* work to *any* independent contractor, and to perform the work with its own employees. This is consistent with the "stand-by" nature of the contract, as illustrated by the City's failure to assign any work at all to the independent contractor retained in 1980.

Had the City determined to assign work to independent contractors, unlawfully terminated Kenyon's contract, and assigned the work to someone else, perhaps a different case would be presented. Under the facts of this case, however, Kenyon had nothing more than a mere possibility of receiving some assignments if the City saw fit to give them to him. Had the City simply given him none, it would have been acting well within its rights. "One has no constitutional right to a 'remedy' against the lawful conduct of another," *Jones v. Hopper,* 410 F.2d 1323 (10th Cir.1969), *quoting Senn v. Tile Layers Protective Union,* 301 U.S. 468, 483, 57 S.Ct. 857, 864, 81 L.Ed. 1229 (1937). Kenyon cannot transform the City's conduct into a constitutional deprivation of property simply by claiming that the contract was terminated. Were this argument accepted, every breach of contract by every municipal and state government would be actionable under § 1983 as a violation of the contractor's civil rights.

Even if the contract was terminated, as Kenyon asserts, the effect is precisely the same as if the City had elected to make no assignments at all. No money was available. No one else was assigned work that should have been assigned to Kenyon. The possibility of receiving some mowing assignments of which Kenyon was "deprived" simply was not property as that term is

used in the Fourteenth Amendment: Kenyon had only a unilateral expectation, abstract need, or desire for the mowing assignments, rather than the required legitimate claim to those mowing assignments as benefits due to him, *see Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Vinyard v. King,* 655 F.2d 1016, 1019 (10th Cir.1981). The § 1983 claim must be dismissed.

Because there is no independent ground of federal jurisdiction without the § 1983 claim, Kenyon's pendent state law breach of contract claim must be dismissed as well. Because Kenyon should be free to pursue that claim in the appropriate state forum, however, the claim will be dismissed without prejudice.

IT IS THEREFORE ORDERED that this case be dismissed in its entirety, the pendent state law claim without prejudice, costs to be borne by the plaintiff, Robert Kenyon.