No. 45,016

MOUNTAIN IRON AND SUPPLY COMPANY, a Corporation, *Appellee* and *Cross Appellant*, v. GEORGE R. JONES and ALBERT J. GEBERT, III, *Appellants* and *Cross Appellees.*

(441 P. 2d 795)

Opinion filed June 8, 1968.

*William L. Oliver, Jr.,* of Wichita, argued the cause, and *George B. Collins, Robert Martin, K. W. Pringle, Jr., William F. Schell, Robert M. Collins, William V. Crank* and *Tom C. Triplett,* all of Wichita, and *Thomas M. Burns* and *Peter J. Wall,* both of Denver, Colorado, were with him on the brief for the appellants and cross appellees.

*Richard W. Stavely,* of Wichita, argued the cause and was on the brief for the appellee and cross appellant.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action brought by Mountain Iron and

Supply Company against George R. Jones and Albert J. Gebert, III, as officers, directors and stockholders of Jones-Gebert Oil, Inc., a bankrupt corporation, for the debts of that corporation.

In Count I of the petition the plaintiff seeks to recover from the defendants on their personal guarantee of a corporate note which was secured by a rotary drilling rig owned by the corporation. This note was purchased by the plaintiff after it had acquired title of the drilling rig through foreclosure of its second mortgage on the rig.

In Count II the plaintiff seeks to hold the defendants personally liable for the amount of "watered stock" which was acquired by the defendants when the corporation was formed. This is based on the allegations that Jones-Gebert Oil, Inc. was undercapitalized at the time of its formation.

In Count III the plaintiff alleges that Jones-Gebert Oil, Inc. was a sham corporation formed to defeat creditors of the defendants, and that the defendants intermingled and commingled their affairs with the affairs of the corporation.

In the petition the plaintiff sought judgment against the defendants in the sum of $16,000 together with interest and costs on its first cause of action; $12,290.97 with interest and costs on its second cause of action; and the sum of $44,075.77 with interest and costs on its third cause of action, "except that credit should be given on the third cause of action for the recoveries, if any, allowed by the court on the first and second causes of action."

The case was tried to the court and judgment was entered for the plaintiff on Count I, and for the defendants on Counts II and III. Both sides have appealed from the decisions of the court adverse to them.

The principal issues presented are: (1) Whether on the facts in this case the defendants were released on their personal endorsement of the corporate note; and (2) whether the defendants are liable for the debts of the corporation on either the theory of "watered stock" or that the corporation was a sham and fraudulent.

In view of the specific issues presented, it will be necessary to state the facts in some detail.

In 1959 George R. Jones and Albert J. Gebert, III (defendants-appellants and cross appellees), together with Jerry E. Shawver and E. B. Shawver, formed a partnership by the name of Jones-Gebert Oil Co., to engage in the business of producing and exploring for oil and gas. Beginning in the year 1961 the partnership proposed to

drill a number of wells, and it was decided that the partnership should purchase a drilling rig instead of contracting for the drilling of wells as it had done in the past. The partners decided to put the drilling rig in a corporation to make use of the limited liability available through a corporate form of business in such a hazardous occupation as drilling oil and gas wells. Therefore, on the 6th day of February, 1961, Jones-Gebert Oil, Inc. was formed and the defendants transferred to the corporation $15,000 in cash from personal sources. In addition, all of the partners in Jones-Gebert Oil Co. transferred to the corporation assets of the partnership valued at $37,436.45, and partnership liabilities of $22,436.45. The assets were transferred by a letter to the corporation from the partners, which was made a part of the minutes of the corporation, and a bill of sale. Included in the assets transferred to the corporation were undeveloped oil and gas leases in McPherson and Sumner Counties, Kansas. These leases were described in the letter but were not contained in the bill of sale. The difference between the value of the assets and liabilities which were transferred was $15,000, which, when added to the cash contribution, made a net capitalization of $30,000. The capital stock of Jones-Gebert Oil, Inc., was issued one-third to George R. Jones; one-third to Albert J. Gebert; one-sixth to Jerry E. Shawver; and one-sixth to E. B. Shawver, which was the same ratio of ownership that the partners had in Jones-Gebert Oil Co. The partnership of Jones-Gebert Oil Co. remained in existence and functioned as a producing company, and the corporation, Jones-Gebert Oil, Inc., functioned as a drilling company.

On the 18th day of October, 1963, the corporation borrowed the sum of $26,000 from the McPherson & Citizens State Bank of McPherson, Kansas, in the form of a promissory note secured by a mortgage on a Brewster N-4 drilling rig. The face of this note was signed by Jones-Gebert Oil, Inc., through Albert J. Gebert, III, as president and secretary-treasurer. The defendants signed the note on the back as personal guarantors of the corporate obligation.

Mountain Iron and Supply Company, a corporation (plaintiff-appellee and cross appellant), is an oil field supply house with its principal office in Wichita, Kansas. The plaintiff's credit manager, Clyde Niernberger, testified that in February, 1961, when Jones-Gebert Oil, Inc., was formed, the plaintiff's sales department was aware of that fact and obtained routine credit reports on the corporation. These reports contained a statement of the paid-in capital

of the corporation. However, it was not until October, 1962, that the plaintiff transacted any business with Jones-Gebert Oil, Inc.

In 1962 the corporation requested a line of credit from the plaintiff, which was granted even though the plaintiff had credit reports which showed that the corporation was having difficulty. The plaintiff admits that it knew it was extending credit to Jones-Gebert Oil, Inc., as a corporation and not to Jones-Gebert Oil Co. (the partnership) or to any of the individuals involved. The corporation soon fell behind on its credit line with the plaintiff, which then obtained a second mortgage on the rotary drilling rig heretofore described, which had previously been mortgaged to the McPherson & Citizens State Bank. The promissory note secured by the second mortgage was for $44,329.08. At that time the plaintiff attempted to get the defendants to personally guarantee the second mortgage note, which the defendants unequivocally refused to do. The plaintiff knew there was a first mortgage on the drilling rig.

On the 4th day of October, 1963, the defendants sold their interest in Jones-Gebert Oil Co. (the partnership) to the Shawvers, who in turn assigned their stock in Jones-Gebert Oil, Inc. (the corporation) to the defendants.

On the 8th day of July, 1964, Jones-Gebert Oil, Inc. was put into an involuntary bankruptcy. This was shortly after the plaintiff had taken possession of the drilling rig on June 22, 1964, pursuant to the second mortgage. The plaintiff did not file a claim in the bankruptcy proceeding, but was apparently content to foreclose its second mortgage on the drilling rig which it sold to itself on the 2nd day of October, 1964, for the sum of $17,000.

By this time the first mortgage note to the McPherson & Citizens State Bank had been paid down to approximately $16,000. On the 10th day of November, 1964, the plaintiff purchased this bank note for $16,613.30 and received an assignment of the note and first mortgage. The plaintiff then made a demand upon the defendants for that amount on the 25th day of January, 1965; and on the 1st day of February, 1965, the defendants tendered a certified check in the amount of $16,778.76 for the payment in full of the promissory note *upon the condition* that the defendants be subrogated to the security for the note and receive an assignment of the first mortgage. This tender was refused by the plaintiff.

This action was filed and discovery commenced during the time that the Jones-Gebert Oil, Inc. bankruptcy proceeding was pending.

The plaintiff filed interrogatories requesting information with regard to the formation of Jones-Gebert Oil, Inc. The defendants when answering the interrogatories did not have the books and records of the corporation which were in the possession of the trustee in bankruptcy. The defendants did have a copy of the bill of sale which did not show the transfer of the undeveloped oil and gas leases in McPherson and Sumner Counties, Kansas. Therefore, in answering the interrogatories with regard to what property was transferred to the corporation, the defendants attached the bill of sale and stated that the undeveloped leases in McPherson and Sumner Counties, Kansas, were retained by the partnership. The defendants also stated that the capitalization of the corporation was $30,000 for which stock was issued in consideration of $15,000 cash and $15,000 in property. In these same interrogatories the defendants specifically stated they did not have the corporate minute book of the corporation, and that information in regard thereto was available through the attorney for the trustee in bankruptcy.

The defendants objected to some interrogatories which would involve extensive auditing of the corporate records, and the trial court sustained the objection. Further interrogatories were filed and the defendants answered to the best of their ability.

Subsequent to the answers to the interrogatories, both the plaintiff and the defendants entered into a stipulation with the trustee in bankruptcy of Jones-Gebert Oil, Inc., by which the plaintiff was granted access to the books and records. This stipulation was approved by the court. The plaintiff then served requests for admissions on the defendants which attached copies of the minutes of the corporation showing that the undeveloped oil and gas leases in McPherson and Sumner Counties were transferred to the corporation at the time of its formation. Accordingly, the defendants corrected their answers to the previous interrogatories in their response to requests for admissions.

The plaintiff also conducted extensive discovery with regard to "affiliated" companies of Jones-Gebert Oil, Inc. The corporation shared overhead and personnel with the partnership and Navajo Drilling Company. However, separate books were kept for each company and all sums which were owed by the partnership or Navajo Drilling Company to the corporation were paid. The accountant employed by the corporation was also employed by the bankruptcy court to audit the books of the corporation. He testi-

fied the books were handled according to standard accounting practices and principles; that the accounts of the partnership and Navajo Drilling Company were kept separate and fully accounted for; and that there was no intermingling or commingling of the defendants' affairs with those of the corporation. The evidence is uncontroverted that all sums due to the corporation, either through the sharing of overhead with other companies or advances made to the defendants individually, were paid in full.

The only evidence introduced by the plaintiff with regard to Counts II and III of the amended petition were the answers to the interrogatories. The defendants, however, both testified in person at the trial regarding the fact that the stock each received in the corporation was fully paid for, and that there was no improper corporate manipulation. The accountant and the bookkeeper for the corporation testified and corroborated the defendants' testimony. Jerry Shawver, one of the original partners in the partnership and one of the original stockholders in the corporation, was questioned as a witness on behalf of the defendants. He testified that the property set forth in the letter transferring assets of the partnership to the corporation was actually transferred to the corporation, and that the evaluation of the property was adequate and fair. He also testified that great care was taken to distinguish between any bills owed by the partnership and the corporation, and that he knew of no improper corporate activity during his connection with the corporation. The original books of entry of the corporation were introduced which showed that property valued at $37,436.45 plus $15,000 in cash was transferred to the corporation, as well as $22,436.45 in liabilities, for a net capitalization of $30,000.

In its findings of fact the trial court found the undeveloped leases in McPherson and Sumner Counties had, in fact, been transferred to the corporation; that the stock received by the defendants in the corporation was fully paid for; that there has never been any intermingling or commingling of the defendants' personal affairs with the affairs of the corporation; and further that the corporation was not formed as a sham corporation or that the defendants operated in any manner with any fraudulent purpose or intent.

The trial court entered judgment on Count I in the amended petition in favor of the plaintiff, holding that the defendants were liable to the plaintiff on their personal endorsement of the note, which was originally given to the McPherson & Citizens State Bank,

in spite of the fact that the defendants had tendered the amount due on the note on the condition that they receive the security. Judgment was entered for the defendants on Counts II and III.

As to Count I the defendants filed a motion for a new trial on the ground of newly discovered evidence, and that the decision was procured by the corruption of the plaintiff. The basis for this motion was the plaintiff's publication entitled "Portfolio of Used Rotary Equipment" in which the very drilling rig that was security for the note to the McPherson & Citizens State Bank was valued by the plaintiff at $50,000. The publication states it was effective as of July 15, 1966, which is one day after the plaintiff introduced evidence at the trial evaluating the rig at approximately $16,000.

On the foregoing facts were the defendants released on their personal guarantee of the bank note? Or, stated conversely, on the facts in this case did the trial court err in finding as a matter of law that the defendants were liable to the plaintiff on their personal guarantee of the indebtedness of the corporation on the bank note?

The evidence is uncontroverted that the defendants' signature on the back of the promissory note to the McPherson & Citizens State Bank was a personal guarantee of the indebtedness of Jones-Gebert Oil, Inc., which was the primary party. As security for the indebtedness the corporation mortgaged a rotary drilling rig which was shown to have a cost of $45,000. The principal amount of the note was $26,000.

At this point, the rights of the parties are easy to determine. If the corporation defaulted in the payment of the note, then the McPherson & Citizens State Bank could either foreclose the mortgage on the drilling rig or call upon the defendants to pay the note based on their personal guarantee. If the bank took the latter course of action, then the defendants would be subrogated to the security and be able to recoup their loss by taking over or foreclosing on the drilling rig. This situation, however, is complicated by the fact that the corporation gave a second mortgage on the drilling rig to the plaintiff which was foreclosed, and then the plaintiff purchased the bank note and first mortgage. The question is whether these facts changed the position of the defendants with regard to their right of subrogation.

When the plaintiff made its demand upon the defendants to pay the first mortgage note, the defendants were entitled to be subrogated to the security in the same manner that they would have

been had there been no second mortgage. It is the position of the defendants that the plaintiff's refusal of their tender *on the condition* that they receive the security released them on their obligation. The defendants do not contend they were not liable, as such, on their guarantee of the first mortgage, but they do claim the right of subrogation when called upon to pay the first mortgage note. That is not to say they were entitled to the drilling rig free and clear of any ownership, but only that they had the right to the security to satisfy their loss. As would be the case with the mortgagee, they would be required to return any amounts recovered from the sale of the mortgaged property over and above the amount of their guarantee to the owner (in this case the plaintiff). A guarantor who is called upon to pay an indebtedness to a creditor "steps into the shoes" of the creditor and is entitled to the same rights that the original mortgagee had.

Kansas follows the rule that when a guarantor of an obligation is called upon by the creditor to pay the indebtedness, the guarantor or surety is entitled to be subrogated to the rights of the creditor against the principal. (*Blitz v. Metzger*, 119 Kan. 760, 241 Pac. 259; and *Bolman v. Commercial National Bank*, 173 Kan. 155, 244 P. 2d 1175. Also, see, K. S. A. 84-9-504[5] where this principle is codified in the Uniform Commercial Code, effective January 1, 1966.)

In the recent case of *United States Fidelity & Guaranty Co. v. Maryland Cas. Co.*, 186 Kan. 637, 352 P. 2d 70, the court held this was "legal" subrogation grounded in equity and arising by operation of the law. Reference is made to *Blitz v. Metzger*, supra, for a discussion of the doctrine of subrogation.

The plaintiff relies upon the rule of law that a guarantor or surety is not entitled to be subrogated to the rights of a creditor until the claim of the creditor has been paid in full. (Citing, *Spire v. Spire*, 104 Kan. 501, 180 Pac. 209; 50 Am. Jur., Subrogation, § 28, p. 701; and cases above cited.) The plaintiff quotes *United States Fidelity & Guaranty Co. v. Maryland Cas. Co.*, supra, where the court stated in syllabus ¶ 3 as follows:

". . . The rule against subrogation on part payment is that a creditor cannot equitably be compelled to split his securities, and give up control of any part until he is fully paid. . . ."

(See annotation entitled "Application of payments as between debts for which a surety or guarantor is bound and those for which he is not," in 57 A. L. R. 2d 855, 877, appended to *Mid-Continent*

*Supply Co. v. Atkins & Potter Drill. Corp.,* 229 F. 2d 68, 57 A. L. R. 2d 849 [10th Cir. 1956], decided under Oklahoma law.)

In the *Spire* case, *supra,* the factual situation was that A and B were comakers of a note to C but as between A and B, A was, in fact, a surety. A paid the note to C and claimed subrogation. The court held that as to C, A was a primary party, and as such, he was not entitled to subrogation because only sureties and guarantors as to creditors are entitled to subrogation. In the instant case it is clear the defendants were not comakers in relation to the creditor, but were clearly sureties or guarantors, and as such, would be entitled to subrogation under the *Spire* case.

The defendants were individually liable only as guarantors of the first mortgage note. They had no intention of being liable to anyone else for any other indebtedness of Jones-Gebert Oil, Inc. The plaintiff made several attempts to get the personal guarantee of the defendants on the corporate note to the plaintiff secured by the second mortgage, which the defendants steadfastly refused to do.

To allow the plaintiff to prevail on Count I would have the effect of increasing the indebtedness for which the defendants were secondarily liable beyond the scope of their original endorsement and the terms of the first mortgage. One of the protections afforded a surety is the right of subrogation, and the defendants contracted only with regard to a $26,000 liability which carried the drilling rig as security.

The theory advanced by the plaintiff, that a surety is not entitled to subrogation until the creditor's claim is paid in full, is fallacious on the facts in this case for two reasons. First, the debt which the defendants guaranteed had a balance of only $16,000 plus interest, and the $45,000 indebtedness which the plaintiff seeks to add was not one which was due to the original or primary creditor as was the situation in the *Mid-Continent Supply Co.* and *Spire* cases. Here the plaintiff sought to gain an advantage that the original creditor did not have by purchasing the indebtedness and adding it to its own to take advantage of the defendants' endorsement.

The second fallacy brings into consideration the doctrine of merger. It is a general rule in Kansas that when the purchaser of encumbered land also purchases the encumbrance and holds as owner and mortgagee, the matter of merger is usually one of choice and not one of compulsion. (*New v. Smith,* 94 Kan. 6, 145 Pac. 880; and see the discussion of merger in *Aguilera v. Corkill,* 201 Kan. 33,

38, 439 P. 2d 93. Also, see an annotation at 29 A. L. R. 702, that the rules for merger of estates as applied to mortgages are the same for real and personal property.) If the doctrine of merger does not apply, the plaintiff cannot add its indebtedness to the one it purchased from the bank in order to claim that the defendants are not entitled to subrogation because the entire debt has not been paid. If, on the other hand, the doctrine of merger does apply, then the first mortgage is merged into the plaintiff's title and the defendants' guarantee is extinguished. The plaintiff should not be entitled to claim on the one hand that there is no merger so the first mortgage and guarantee will remain in existence, and on the other claim that subrogation is inapplicable because both debts were not paid.

After the plaintiff had foreclosed its second mortgage, its title was still subject to the outstanding encumbrance to the bank. If the bank then foreclosed on the rig, the plaintiff would be entitled to any amount that the sale brought above the $16,000 plus interest due the bank, and the defendants' guarantee would have been released. If the bank had elected to proceed against the defendants on their guarantee, then the plaintiff, as owner, would be entitled to any amounts realized by the defendants from the sale of the rig above the amount they had to pay to the bank on their guarantee. Either way, the defendants would not be required to pay the debt and lose the security with no means of recoupment. How could the plaintiff, by simply taking an assignment of the first mortgage, improve its position to the extent that the defendants are required to pay the $16,000 plus interest for the plaintiff's purchase of the assignment?

The plaintiff could not acquire any greater rights than the bank, yet under the lower court's ruling, the plaintiff now has the rig free of the first mortgage without costing the plaintiff a cent. It has been held that a private or gratuitous surety is a favorite of the law. (*Stull v. Allen*, 165 Kan. 202, 193 P. 2d 207; and *Ryan v. Scovill*, 147 Kan. 748, 78 P. 2d 877.)

Here the defendants guaranteed the first mortgage note with knowledge of the fact that the mortgage was secured by the drilling rig which would be available to them through subrogation, if they were called upon to pay their guarantee. They were entitled to rely upon the fact that the security would be applied to the payment of the debt or be delivered to them if they had to make

payment. Under the circumstances presented by the facts in this case, the defendants' demand for the security was reasonable in law and in fact, and the judgment of the lower court on Count I should be reversed.

Inasmuch as the drilling rig sold for more than the indebtedness due on the first mortgage, it becomes immaterial to consider the defendants' contention that the trial court erred in failing to grant them a new trial on the grounds of newly discovered evidence.

Turning now to the plaintiff's cross appeal it may be said, after carefully analyzing and reviewing the record, that the trial court's findings of fact and judgment for the defendants on Counts II and III are supported by substantial competent evidence. On appeal the plaintiff has failed to sustain the burden of showing that the findings made by the trial court are "clearly erroneous." (K. S. A. 60-252[a].)

Under Count II the plaintiff was required to prove actual fraud because this is strictly a statutory cause of action based on the alleged failure of the defendants to pay the full consideration for their stock in the corporation. The shareholder's liability for "watered stock" is set out in K. S. A. 17-3206, which reads:

"Subscriptions to, or the purchase price of, the capital stock of any domestic corporation may be paid for, wholly or partly, by cash, by labor done, by personal property, or by real property or leases thereof; and the stock so issued shall be declared and taken to be full-paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments. *And in the absence of actual fraud in the transaction, the judgment of the directors as to the value of such labor, property, real estate or leases thereof, shall be conclusive.*" (Emphasis added.)

In view of the trial court's findings it is immaterial to pursue the cross appeal further and discuss matters of law relating to the individual liability of officers, directors and stockholders of a corporation.

The judgment of the lower court as to Count I is reversed, and as to Counts II and III it is affirmed.