474 A.2d 904

**Ruth W. WEAST**

v.

**Francis A. ARNOLD et ux.**

**No. 62, Sept. Term, 1983.**

Court of Appeals of Maryland.

May 10, 1984.

Motion for Reconsideration Denied June 8, 1984.

---

Arthur G. House, Bethesda, for appellant.

Malcolm B. Kane, Ellicott City (Lloyd, Kane & Wieder, Ellicott City, on the brief), for appellees.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

This is a suit against the makers of promissory notes which the payee pledged as collateral for a loan. The delinquent balance on that loan has been paid by the pledgor's surety who thereby acquired the notes and who now sues on them. Contrary to the trial court's conclusion we shall hold that the plaintiff enjoys holder in due course status, as transferee of the lender's rights in the notes, but only to the extent of the lender's security interest in the notes. The excess of the plaintiff's claim is subject to a breach of contract defense on which the defending makers proved entitlement to no more than nominal damages as a setoff.

On September 26, 1972 George E. Weast, Jr. (George), then the husband of the plaintiff, Ruth W. Weast (Ruth), borrowed $140,000 from State National Bank of Maryland (SNB). Ruth had "co-signed for [her] husband" in connection with this indebtedness. Although the documents evidencing this loan are not in evidence, the premise on which the parties presented the instant case was that, as between Ruth and George, George was the principal obligor and Ruth was an accommodation party. We shall call this obligation and its later modifications the "Weast debt." By November of 1973 the Weast debt was in default and an agreement was reached with SNB modifying the terms. As

part of this modification the notes on which the instant suit is based were made part of SNB's security. The notes came about in the following manner.

On November 23, 1973 George sold to Francis A. Arnold (Francis), one of the defendants, and to Randall Printing Company, Inc., a District of Columbia corporation (Randall Co.), common stock in Randall Co. Consideration moving to George in this transaction included three promissory notes in the combined original principal amount of $100,000, consisting of respective face amounts of $41,364, $38,636 and $20,000. Francis and his wife, Josephine Arnold (Josephine), the other defendant herein, signed each of the notes as makers. Randall Co. also signed the $38,636 note as a maker. We shall call these three notes the "Arnold notes." Francis and Randall Co. each pledged the Randall Co. stock respectively purchased by them as security and cross-security for the payment, *inter alia,* of the Arnold notes. Subsequently Randall Co. failed so that neither it nor its stock are involved in the case before us.

As part of the restructuring of the Weast debt to SNB, George on November 27, 1973 executed a security agreement in favor of SNB and indorsed the Arnold notes to the order of SNB. The security agreement recited that "as collateral security for the payment of any and all indebtedness" of George the Arnold notes and the pledges of Randall Co. stock had been "deposited with" and "pledged" to SNB. SNB was "also given a lien upon the title or interest of [George] in all property and securities now in ... the custody or possession of the Bank ...." The Arnolds were notified to make payments on their notes to SNB. Further to secure SNB, George and Ruth placed a second deed of trust on their residence in favor of SNB.

George petitioned for voluntary bankruptcy on July 1, 1975 in the District of Maryland. He listed SNB as a secured creditor and stated the principal balance due SNB, without accumulated interest, to be $104,235.12. His petition referred to the second lien on the residence and the

Arnold notes as SNB's security. On April 5, 1977 George received a discharge in bankruptcy. The trustee of George's bankruptcy estate reported there to be no assets and the bankruptcy judge, also on April 5, 1977, approved that report and ordered the estate closed.

Payments to SNB on the Arnold notes ceased in the summer of 1976. At the times of the defaults on those notes the principal balances due totaled $67,844.22. SNB never sued on the Arnold notes.

About December 23, 1975 George and Ruth entered into a voluntary separation, support and property settlement agreement under which George was required to assign to Ruth all of George's interest in the Arnold notes. The Weasts were divorced June 10, 1976. By a writing dated June 3, 1976 George assigned "all rights and interests" in the Arnold notes to Ruth. This assignment was made after George had been adjudicated a bankrupt but before his discharge and the closing of his bankruptcy estate. The Arnold notes were then in the possession of SNB and were not, and never have been, indorsed by George to Ruth.

The record in this case leaves us uninformed as to whether there were any credits against the Weast debt, once payment on the Arnold notes ceased, until 1979. In order to avoid foreclosure of the deed of trust held by SNB on the residence, Ruth, on June 5, 1979, agreed with SNB to sell the property and, from the proceeds, to pay all principal and accrued interest on the Weast debt. Ruth also agreed to the release of $10,000 to SNB from the principal of an escrow account, together with the interest earned thereon, all of which was applied to the Weast debt, including counsel fees to SNB's attorneys. The total paid by Ruth in 1979 in order to satisfy the Weast debt to SNB appears to have been approximately $58,400.

One aspect of the settlement between Ruth and SNB was that SNB on July 13, 1979 indorsed to the order of Ruth each of the Arnold notes. At the same time Ruth assigned to SNB "all or such part of her interest in any proceeds

collected thereon to the extent of the then unpaid balance of her obligations" to SNB, pursuant to the settlement agreement.

Ruth brought the present action on December 21, 1979 against Arnold and Josephine. Ruth's position at trial was that she acquired her interest in the Arnold notes by indorsement from SNB to her. She measured her claim by the total unpaid principal balance of the Arnold notes, together with 8% per annum interest thereon, as specified in the notes. Computed to February 1, 1982, the day of trial, the claim totaled $97,615.21. The Arnolds' principal contention was that Ruth was subject to a defense based on breach by George of the agreement for sale of Randall Co. stock which gave rise to the Arnold notes. The agreement provided that George, the original pledgee, would release part of the stock from pledge as increments of the stock purchase price were paid. One of these payment levels had been reached in 1974 but SNB, George's pledgee, would not release any of the stock. Ruth's reply was that this defense was not available against her because she enjoyed the rights of a holder in due course. Ruth based that status on her being a transferee of SNB which, she said, had acquired the Arnold notes in that capacity. Another issue raised by the Arnolds was that Ruth had acquired from SNB no more than SNB's security interest in the notes.

The trial court, in a written opinion, first considered Ruth's possible entitlement to the notes as assignee of George in June of 1976. It concluded that the assignment from George to Ruth was invalid because he was then in bankruptcy. We express no views on that holding because it is not before us. Ruth has not challenged that holding in her brief, presumably because she does not desire to trace her interest via assignment from George and thereby, arguably, be subject to defenses, if any, arising out of the alleged breach of the terms of the stock sale transaction between George and Francis. In this Court Ruth stands exclusively on her position that she acquired the same

rights as SNB had, and that they are those of a holder in due course.

The trial court next reasoned that Ruth had become the owner of the Arnold notes by what amounted to a sale to Ruth by SNB of the collateral following default on the Weast debt. George's bankruptcy was pointed to as the event of default. In concluding that SNB had transferred to Ruth full title to the Arnold notes, the court relied on Md.Code (1975), § 9–504(4) of the Commercial Law Article (CL). However, in the view of the circuit court, Ruth was not a holder in due course of the Arnold notes inasmuch as they were in default at the time she acquired them from SNB. Then, because Ruth was an assignee and had not presented any rebuttal to testimony suggesting that the failure of Randall Co. was attributable to the breach of the pledge agreement, it was held that there was "no choice other than to enter judgment in favor of the defendants," Francis and Josephine.

Certiorari was issued on our own motion prior to consideration of Ruth's appeal by the Court of Special Appeals. We shall reverse and remand.

(1)

■ SNB was a holder in due course. Under the test of § 3–302(1) it took the Arnold notes for value, in good faith and without notice that any instrument was overdue or had been dishonored, or that any person asserted a defense against or claim to the instrument.[1] See 5 R. Anderson, Uniform Commercial Code §§ 3–302:13 to 3–302:34 (3d ed. 1984); J. White and R. Summers, Uniform Commercial Code §§ 14–1 to 14–10 (2d ed. 1980). A holder takes an instrument for value "[t]o the extent that ... he acquires a security interest in ... the instrument otherwise than by legal process," or "[w]hen he takes the instrument ... as security for an antecedent claim against any person wheth-

---

1. All statutory references, unless otherwise indicated, are to the Commercial Law Article of the Maryland Code. Titles 1–10 of that article are the Maryland Uniform Commercial Code. *See* § 1–101.

er or not the claim is due." Sec. 3–303(a) and (b). See Anderson, *supra*, §§ 3–303:12–17, § 3–201:14, and § 3–302:35; 2 Bender's Uniform Commercial Code Service, F. Hart and W. Willier, Commercial Paper Under the Uniform Commercial Code §§ 11.03[3]–[4] (1972, 1984 Supp.); Annot., 97 A.L.R.3d 1114, at § 11 (1980, 1983 Supp.). There is no evidence that SNB took the Arnold notes other than in good faith. The notes were then only four days old. Express evidence that no default or dispute existed at that time is uncontradicted. Rights as a holder in due course can be acquired by a lender who takes as security notes of third parties payable to the borrower. *See Third National Bank v. Hardi-Gardens Supply of Illinois, Inc.,* 380 F.Supp. 930 (M.D.Tenn.1974); *In re United East Coast Corp.,* 6 U.C.C.R.S. 449 (E.D.N.Y.1969); *Hollemon v. Murray,* 666 P.2d 1107 (Colo.App.1982); *Finance Co. v. Wilson,* 115 Ga.App. 280, 154 S.E.2d 459 (1967); *Schranz v. I.L. Grossman, Inc.,* 90 Ill.App.3d 507, 45 Ill.Dec. 654, 412 N.E.2d 1378 (1980); *Budget Financial Corp. v. Bernstein,* 42 A.D.2d 893, 347 N.Y.S.2d 593 (mem. 1973), *aff'd,* 35 N.Y.2d 761, 320 N.E.2d 864, 362 N.Y.S.2d 147 (1974); *Wood v. Willman,* 423 P.2d 82 (Wyo.1967).

However, SNB's acquisition of the Arnold notes as a holder in due course does not *per se* give SNB full title to and ownership of the notes. CL § 3–302(4) provides that "[a] purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased." Hart & Willier, *supra,* § 12.02[3] at 12–14–15, explain the concept more fully.

Being a holder of is not synonymous with having title to an instrument. "Title" in an ownership sense consists of a number of different kinds of interests.... Article 3 honors this distinction by providing:

(1) A transferee can be a transferee of a "security interest," something less than ownership.

(2) A lien on or security in a negotiable instrument to secure an antecedent debt constitutes "value."

(3) "Value" is measured by what is actually given for an instrument as opposed to what is promised, or by the extent of the lien or security interest of the holder.

(4) A holder may have a limited interest and be a holder in due course only to the extent of that interest.

(5) A holder in due course has rights "to the extent he is a holder in due course," implying that he may not have all rights of such a holder.

The result is that a holder or transferee may not have or succeed to *all* rights of a holder or may have *all* such rights but be entitled to limited enforcement.

Article 9 provides that a security interest in any personal property, including negotiable instruments, may be created by a security agreement signed by the debtor. However, such an interest can be protected against the interest of third persons who may acquire conflicting interests only by the secured party's taking physical possession of the instruments. Thus, only when a secured party in fact takes possession *can* he be a holder under Article 3 and be protected under Article 9. While the secured party must give value to create a security interest, what he is acquiring is governed by Article 9. He is not a buyer of the instrument as such. Article 9 governs the sale of accounts, contract rights, and chattel paper, but not negotiable instruments alone. Article 3 governs their sale. [Emphasis in original; footnotes omitted.]

Because SNB acquired only a security interest in the Arnold notes, its rights as a holder in due course extended only to that security interest. The result is recognized in Comment 4 to § 3–302.

A purchaser of a limited interest—as a pledgee in a security transaction—may become a holder in due course, but he may enforce the instrument over defenses only to the extent of his interest, and defenses good against the pledgor remain available insofar as the pledgor retains an equity in the instrument. This is merely a special application of the general rule (Section 1–201) that a purchaser

of a limited interest acquires rights only to the extent of the interest purchased.

*See Third National Bank v. Hardi-Gardens Supply; In re United East Coast Corp.; Hollemon v. Murray; Finance Co. v. Wilson; Schranz v. I.L. Grossman, Inc.; Wood v. Willman,* all *supra. See also Rozen v. North Carolina National Bank,* 588 F.2d 83 (4th Cir.1978).

The next question is whether Ruth acquired SNB's holder in due course status as Ruth contends she did.

(2)

■ In deciding that Ruth was not a holder in due course the trial court applied § 3–302(1) to Ruth as of the time SNB indorsed the notes to Ruth. However Ruth's argument that she achieved holder in due course status rests on the "shelter" provision of § 3–201. That section reads in relevant part:

(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.

(2) A transfer of a security interest in an instrument vests the foregoing rights in the transferee to the extent of the interest transferred.

Ruth is not a prior holder of the Arnold notes. Nor has it been suggested that she was party to any fraud or illegality affecting those instruments. Thus, under § 3–201(1) SNB, as a holder in due course, transferred its rights as such a holder to Ruth. This result is explained in Official Comment 3 to § 3–201:

A holder in due course may transfer his rights as such. The "shelter" provision of the last sentence of the original Section 58 is merely one illustration of the rule that anyone may transfer what he has. Its policy is to assure

the holder in due course a free market for the paper, and that policy is continued in this section.

The comment is followed by illustrations of which example (a) is particularly pertinent here.

A induces M by fraud to make an instrument payable to A, A negotiates it to B, who takes as a holder in due course. After the instrument is overdue B gives it to C, who has notice of the fraud. C succeeds to B's rights as a holder in due course, cutting off the defense.

In the instant case, even though the Arnold notes were overdue, and even if Ruth knew when SNB indorsed to her that the Arnolds asserted a breach of contract defense, Ruth nevertheless succeeded to SNB's status as a holder in due course. As to the "shelter" provision of § 58 of the Uniform Negotiable Instruments Law, *see United States Fidelity & Guaranty Co. v. Wells*, 246 Ark. 255, 258, 437 S.W.2d 797, 798–99 (1969) ("It is immaterial that the transferee of a note from a holder in due course took it after maturity ... or without payment of value ... or with notice of existing equities, infirmities or defenses ....") (citations omitted); *Tesdahl v. Hiebert*, 148 Mont. 241, 419 P.2d 298 (1966). For a case applying § 3–201(1) of the U.C.C. to cut off defenses of the maker of a note acquired by an insolvent bank as a holder in due course and subsequently assigned by it to the F.D.I.C., *see F.D.I.C. v. Russo*, 89 A.D.2d 575, 452 N.Y.S.2d 231, (mem.), *aff'd*, 58 N.Y.2d 929, 447 N.E.2d 81, 460 N.Y.S.2d 532 (1982). See generally *Canyonville Bible Academy v. Lobemaster*, 108 Ill.App.2d 318, 247 N.E.2d 623 (1969); *Perry v. Schlaikjer*, 5 Mass.App. 866, 367 N.E.2d 863 (1977); *Cantrell v. Cafourek*, 513 S.W.2d 690 (Mo.App.1974); *Estrada v. River Oaks Bank & Trust Co.*, 550 S.W.2d 719 (Tex.Civ.App.1977, *writ ref'd n.r.e.*); *First & Citizens National Bank v. F.D.I.C.*, 210 Va. 434, 171 S.E.2d 856 (1970); Anderson, *supra*, § 3–201:4 and § 3–201:22; Hart & Willier, *supra*, § 12.02; Annot., 23 A.L.R.3d 932, 946–47 (1969).

Here SNB's status as a holder in due course extended only to its security interest. Accordingly, as SNB's transferee, Ruth's holder in due course status extends only to the security interest. The result is explicit in § 3–201, dealing with the rights of transferees of instruments, which provides in subsection (2) that "[a] transfer of a security interest in an instrument vests [such rights as the transferor has therein] in the transferee to the extent of the interest transferred." See Official Comment 5 to § 3–201; *Vinson v. McCarty*, 413 So.2d 1026 (Miss.1982); *Miller v. Merchants Bank*, 138 Vt. 235, 415 A.2d 196 (1980); *Western National Bank v. Harrison*, 577 P.2d 635 (Wyo.1978); Anderson, *supra*, § 3–201:4; Hart & Willier, *supra*, § 3:11 at 3–35.

(3)

The foregoing conclusion necessarily means we do not agree with the circuit court's analysis of Ruth's acquisition of the notes. Basically that court said that the following steps had occurred:

1. The security agreement between George and SNB relative to the Arnold notes provided that George's bankruptcy could be a default.

2. George defaulted by petitioning for bankruptcy.

3. SNB took possession of the collateral under § 9–503(1).[2]

4. SNB sold the Arnold notes pursuant to § 9–504(4), dealing with the disposition of collateral by a secured party after default.[3]

---

**2.** Section 9–503(1) in relevant part reads that "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral."

**3.** Section 9–504(4) provides:

When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the

The fact of the matter is that SNB did not take possession of the collateral as a consequence of default. SNB had been in possession of the Arnold notes, which were indorsed by George to the order of SNB. Nor did default on the Weast debt, whether by George's bankruptcy or by failure to pay, result in a sale of the Arnold notes. SNB simply ignored its security interest in the Arnold notes and pressed Ruth based on her obligation for the Weast debt. When Ruth paid SNB in 1979 she discharged her obligation to SNB on the Weast debt.

■ Even though Ruth was obligated to SNB, as between her and George, George was the principal debtor and Ruth was simply an accommodation party. The relation between George, Ruth and SNB was one of suretyship, as defined in Restatement of Security § 82 (1941), reading:

Suretyship is the relation which exists where one person has undertaken an obligation and another person is also under an obligation or other duty to the obligee, who is entitled to but one performance, and as between the two who are bound, one rather than the other should perform.

■ It is well-settled that a surety who pays the debt for the principal obligor becomes subrogated to the rights of the creditor, including rights in the security. We said in *Finance Co. v. United States Fidelity & Guaranty Co.,* 277 Md. 177, 182, 353 A.2d 249, 252 (1976) that "[s]ubrogation is a long-standing equitable doctrine in Maryland whereby one who is secondarily liable for a debt, and has paid it, stands in the place of the creditor ... and is entitled to the benefit of all the securities and remedies which could have been resorted to for the payment of the debt." See

---

secured party fails to comply with the requirements of this subtitle or of any judicial proceedings.

(a) In the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or

(b) In any other case, if the purchaser acts in good faith.

*Blair v. Baker,* 196 Md. 242, 76 A.2d 129 (1950); *Embrey v. Embrey,* 163 Md. 162, 161 A. 153 (1932); *Wallace v. Jones,* 110 Md. 143, 72 A. 769 (1909); *Orem v. Wrightson,* 51 Md. 34 (1879); *Freaner v. Yingling,* 37 Md. 491 (1873); *Lawson v. Snyder,* 1 Md. 71 (1851); Mullen, *The Equitable Doctrine of Subrogation,* 3 Md.L.Rev. 201, 218–20 (1939). For recent cases applying the principle, see *LeRoy v. Marquette National Bank,* 277 N.W.2d 351 (Minn.1979); *Murray v. Payne,* 437 So.2d 47 (Miss.1983); *O'Hara v. First National Bank,* 613 S.W.2d 306 (Tex.Civ.App.1980). And *see generally* 1 Bender's Uniform Commercial Code Service, P. Coogan, W. Hogan, D. Vagts & J. McDonnell, *Secured Transactions under the Uniform Commercial Code* § 5A.06 (1983); D. Dobbs, *Handbook on the Law of Remedies* at 250–52 (1973); 2A Hart & Willier, *supra,* § 13:29; L. Simpson, *Handbook of the Law of Suretyship* at 215–20 (1950); A. Stearns, *The Law of Suretyship* § 11.4 (Elder 5th ed. 1951); 10 S. Williston, *A Treatise on the Law of Contracts* § 1273 (Jaeger 3d ed. 1967).

A good statement of the rule is found in *Reimann v. Hybertsen,* 275 Or. 235, 550 P.2d 436, *modified,* 276 Or. 95, 553 P.2d 1064 (1976). There an accommodation co-maker paid the debt evidenced by notes. The principal obligor had secured the notes by mortgages. Having satisfied the principal debt the accommodation party sued to require the creditor to assign to the plaintiff the mortgages posted as collateral for the principal obligation. In affirming a grant of that relief the court quoted from *Simpson on Suretyship* § 47 at 206–207, the following statement (*id.* at 239, 550 P.2d at 437–38):

"It is universally recognized that the surety upon paying the creditor is entitled to be substituted to the creditor's position. This right is known as the right of subrogation. It amounts to equitable assignment, in that equity will treat the surety as though he were an assignee of the creditor, *standing in his shoes to enforce* the debt against the debtor together with *any collateral held as security for the debt,* entitled to all priorities and immuni-

ties enjoyed by the creditor. Against the creditor, the right is strictly equitable, and is simply *a right that the creditor assign to the surety* his claim against the principal as well as *any security held by him.* It amounts in reality to specific performance, differing only in the respect that the duty of the creditor, which the court enforces, does not arise from contract, but is imposed upon him by equity, to increase the probability of the surety's obtaining reimbursement. The creditor, of course, has no basis upon which he can object to assigning his claim and his security to the surety. \* \* \*." (Emphasis ours; footnotes omitted.)

In the instant matter, SNB indorsed the Arnold notes to Ruth. Absent such indorsement Ruth had an equitable right to compel SNB legally to transfer the security to her.[4]

Ruth's rights to the security as a paying surety were not lost as a result of George's discharge in bankruptcy. George's bankruptcy was administered under the Bankruptcy Act of 1898, as amended, former 11 U.S.C. § 1 *et seq.* (the Act). George's discharge gave him the defense of discharge to SNB's claim against him on the Weast debt and on any instrument evidencing that debt. The discharge was also defensive to a claim by Ruth, as a paying surety, against George as the principal obligor, for reimbursement or indemnity. *See Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915); *Maryland Casualty Co. v. Jones,* 140 Md. 395, 117 A. 765 (1922). However, discharge of the principal obligor does not discharge the surety. *See* § 16 of the Act, former 11 U.S.C. § 34. Under the circumstances of the instant

---

**4.** As discussed further below, Ruth is entitled to maintain an action in her own name on the Arnold notes because SNB indorsed the notes to her. *See* CL § 3–301. She need not look to CL § 15–401, which permits a surety to maintain a cause of action in his own name against the principal debtor. *See, e.g., Nelson v. Close,* 147 Md. 214, 127 A. 751 (1925); *Dinsmore v. Sachs,* 133 Md. 434, 105 A. 524 (1919); *Fuhrman v. Fuhrman,* 115 Md. 436, 80 A. 1082 (1911). We express no opinion on the applicability of CL § 15–401 to the instant case.

matter, which are uncomplicated by questions of preference, fraudulent conveyance or the like, SNB, following default on the Weast debt, could have proceeded against the security unaffected by George's discharge. *See generally* 1A *Collier on Bankruptcy* ¶ 17.29 (14th ed. 1978, 1983 Supp.); 2 G. Gilmore, *Security Interests in Personal Property* § 45.2 at 1284 (1965); 8 *Remington on Bankruptcy* § 3230 (6th ed. 1955). A bankruptcy judge has been held to have committed clear error in finding no value as an asset of bankrupt A in A's potential subrogation claim, as a surety, to the equipment which the principal debtor, bankrupt B, had used to secure the debt guaranteed by A. *In re Ollag Constr. Equipment Corp.*, 578 F.2d 904 (2d Cir. 1978).

The common law principles under which a paying surety is subrogated to the rights of the creditor, including rights in the collateral, are recognized by the U.C.C. CL § 3–415(5) provides that "[a]n accommodation party is not liable to the party accommodated, and if he pays the instrument has a right of recourse on the instrument against such party." See also Official Comments 1 and 5 to § 3–415; *LeRoy v. Marquette National Bank; Murray v. Payne; Reimann v. Hybertsen; O'Hara v. First National Bank; Western National Bank v. Harrison*, all *supra*. See generally *Fithian v. Jamar*, 286 Md. 161, 410 A.2d 569 (1979). Further, subsection (5) of § 9–504, the subsection immediately following the one relied upon by the trial court in its analysis of Ruth's acquisition of the Arnold notes, reads:

A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this title.

Thus, from the standpoint of Article 9, Ruth obtained the same rights in the collateral which SNB had. *See, e.g., Ertel v. Radio Corp.*, 261 Ind. 573, 307 N.E.2d 471 (1974);

*Benschoter v. First National Bank,* 218 Kan. 144, 542 P.2d 1042 (1975), *appeal dismissed,* 425 U.S. 928, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976); *Mountain Iron and Supply Co. v. Jones,* 201 Kan. 401, 441 P.2d 795, *reh'g denied,* 201 Kan. 824, 443 P.2d 185 (1968). There was no sale of the collateral to Ruth when Ruth, a party liable to SNB, received a transfer of the Arnold notes upon paying the Weast debt. *Cf. Community Management Association of Colorado Springs, Inc. v. Tousley,* 32 Colo.App. 33, 505 P.2d 1314 (1973); *Allard v. Ford Motor Credit Co.,* 139 Vt. 162, 422 A.2d 940 (1980).

However, because in this case the collateral consists of instruments, which were transferred to Ruth by indorsement, there is a further wrinkle. It is a wrinkle which we must consider because of a combination of factors. First, Ruth asks that judgment be entered in her favor for the entire principal balance due on the Arnold notes, together with all accumulated interest at the contract rate specified in the notes. Next, Ruth has not proved that, as surety, she paid any part of the Weast debt other than her payments in 1979. Finally it appears that the amount which Ruth claims on the Arnold notes exceeds the balance on the Weast debt at the time Ruth satisfied that balance. In other words, for Ruth to obtain judgment in the full amount requested, she must predicate that part of her claim which exceeds the balance of the Weast debt on some legal theory other than her being subrogated to SNB's security interest.

### (4)

SNB's indorsement of the Arnold notes to Ruth makes Ruth a holder under § 1–201(20).[5] The rights of a holder are set forth in § 3–301 which in relevant part provides that "[t]he holder of an instrument whether or not he is the owner may ... enforce payment in his own name." The

---

**5.** Section 1–201(20) states:

> *"Holder"* means a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank.

result is that a non-owner holder suing on an instrument can be both a holder and a holder in due course as to different interests in the instrument at the same time. Illustrative is *Schranz v. I.L. Grossman, Inc., supra,* 45 Ill.Dec. 654, 412 N.E.2d 1378. In settlement of litigation X Co. executed its promissory note for $60,000 to the plaintiffs. X Co. secured its note to the plaintiffs by a $135,000 note payable to the order of X Co., made by A and guaranteed by B. Both X Co. and A defaulted. In the plaintiffs' suit against A and B the trial court gave judgment for approximately $49,000, the balance due on the $60,000 note, which was treated as limiting the plaintiffs' claim. This was reversed. It was held that the plaintiffs could enforce payment of the $135,000 note. However, the plaintiffs were holders in due course of the $135,000 note only to the extent of their security interest and as to the excess, they were holders who were subject to defenses good against an assignee. To the same effect *see Third National Bank v. Hardi-Gardens Supply, supra,* 380 F.Supp. 930; *In re United East Coast Corp., supra,* 6 U.C.C.R.S. 449; *Hollemon v. Murray, supra,* 666 P.2d 1107; *F.D.I.C. v. Forte,* 94 A.D.2d 59, 463 N.Y.S.2d 844 (1983); *Wood v. Willman, supra,* 423 P.2d 82 (1967); Anderson, *supra,* § 3–302:35 at 514.

In sum, Ruth is a holder in due course to the extent of SNB's security interest in the Arnold notes. Ruth acquired that security interest by subrogation when she paid the balance due on the Weast debt. Ruth is also a holder of the Arnold notes as to any excess of the balance due on the Arnold notes over SNB's interest in the security acquired by Ruth by subrogation.[6] Because the trial court denied

---

**6.** It has been held that the holder of a note who is not the full owner thereof and who enforces payment in his own name is a trustee for the legal owner of the interest not owned by the plaintiff. *See, e.g., Allaire v. Hartshorne,* 21 N.J.L. 665 (1847); *Haas v. Bank of Commerce,* 41 Neb. 754, 60 N.W. 85 (1894); *Wood v. Willman, supra; Wyoming Inv. Co. v. Wax,* 45 Wyo. 321, 18 P.2d 918 (1933). In this case between Ruth and the Arnolds that problem is not presented.

Ruth any holder in due course status in the Arnold notes, and entered judgment for the defendants, we reverse. Whether a remand is required and, if so, the scope of the issues on remand, will turn on the disposition of Ruth's argument that the Arnolds' evidence on the contract defense was insufficient.

(5)

Alternatively Ruth argues that there was no legally sufficient evidence to support the contract defense raised by the Arnolds so that, even if Ruth is not a holder in due course, Ruth was entitled to judgment as a matter of law. These arguments take us into evidentiary detail.

The contract defense is based upon the agreement between Francis and George for the purchase by Francis of stock in Randall Co. The agreement is set forth in a letter of September 28, 1973. It provides for release from pledge of 10% of the stock upon payment of each $8,000 reduction in principal of the purchase price. That partial release provision is incorporated by reference into the stock pledge agreement which also specifies that George will so release "promptly ... within ten (10) days of the reduction in principal ...."

At the time of the sale of stock Randall Co. was indebted to Suburban Trust Company (Suburban), as evidenced by a note dated December 28, 1972 in the original face amount of $125,000. That note was guaranteed by George. The September 28, 1973 stock purchase agreement provided that "[George], through [Francis'] efforts will be released from the guarantee of the Suburban Trust note of approximately $125,000." Default by Randall Co. in the payment of that note to Suburban was also made a default by Francis under the pledge agreement.

By December 3, 1974 principal on the Arnold notes had been sufficiently reduced to require release of 10% of the Randall Co. stock from pledge. On that date Francis' attorney wrote SNB requesting the stock. It was never

released. Francis says this was a breach of contract and that the damages resulting from it offset Ruth's claim.

Ruth counters this argument by referring to the note to Suburban. When SNB received the request for a release of stock it initially took the position that Francis should produce an estoppel letter from Suburban confirming that Randall Co.'s note was current. No letter was furnished and Ruth says this justified non-release. However, the uncontradicted testimony is that the Randall Co.-Suburban note was current at the time of the requested release. In any event, absence of an estoppel letter was not the reason for the failure to release stock after January 13, 1975.

SNB on December 17, 1974 had asked George whether he would approve release of the stock to Francis, but on January 13, 1975 George wrote SNB and insisted that SNB not release any stock without George's written authorization. George claimed there were breaches by Francis of the stock purchase agreement, all as more fully set forth in a letter of December 3, 1974 from George to Francis, a copy of which was enclosed to SNB in George's January 13, 1975 letter. George's December 3, 1974 letter does not refer to any breach of the pledge agreement or to any failure by Randall Co. to keep current its note to Suburban. George does complain in that letter that Francis had not obtained George's release from his guaranty on the Randall Co.-Suburban note. However, the pledge agreement does not incorporate that covenant from the sales agreement. Nor does the pledge agreement expressly make performance of that covenant a condition precedent to performance by George (or by any assignee-pledgee) of the obligation to release part of the stock when sufficient payment was made on the Arnold notes.

Ruth nevertheless contends that the failure by Francis to obtain George's release as a guarantor constituted a breach by Francis of the pledge agreement, which justifies non-release from pledge of Randall Co. stock, because of the provisions of ¶ 2 of the pledge agreement. It reads:

2. *Warranties.* The parties hereby reaffirm all representations and warranties set forth in their letter agreement, as amended, dated September 28, 1973, which agreement is attached hereto and made a part hereof.

We shall assume, *arguendo,* that Ruth's interpretation of ¶ 2 is correct. We shall even assume, *arguendo,* that the sale agreement is properly interpreted to mean that Francis will obtain George's release as a guarantor of the Randall Co.-Suburban note, and not simply that Francis will use his best efforts to do so. We can still rule on the issue as a matter of law. The covenant to obtain George's release does not contain any time by which performance must be rendered. Consequently a reasonable time is implied. The obvious purpose of Francis' covenant was to protect George on his contingent liability to Suburban. The uncontradicted evidence is that, when the note became due, the Arnolds became guarantors on a substituted note of Randall Co. and that they eventually paid Suburban in full. There is no evidence that George paid anything on his guaranty or that he was in any way damaged. Thus, if Francis, at the time he was entitled to have stock freed from pledge, had failed to perform a promise to get George released from guaranty, the breach by Francis was not so substantial as to excuse George, or his assignee, from their promised performance to Francis.

We hold that the refusal to release stock from pledge was a breach of the stock purchase agreement which can be asserted in defense of that portion of Ruth's claim on the Arnold notes as to which she is simply a holder. That portion of the claim is subject to a setoff for nominal damages.

Actual damages, however, are another matter. The sum total of the Arnolds' proof on actual damages is Francis' testimony that, at the time George refused to authorize a release of the stock, there were three potential investors who were looking at Randall Co. and that the release of the stock was very important because Randall Co. wanted to get additional investors and additional financing. The evi-

dence is directed toward consequential damages arising out of loss of a potential collateral transaction. Without intending to imply that this proof satisfies minimum foreseeability requirements, we hold that it is too uncertain as a matter of law. *See Asibem Assoc., Ltd. v. Rill,* 264 Md. 272, 286 A.2d 160 (1972); *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 112 A.2d 901 (1955). Here there was no effort to show that a specific potential investor was in fact lost as a result of the pledgee's breach and there was no effort to prove the amount of the damage or loss thereby caused to Francis and/or Josephine.[7]

#### (6)

■ There remain to be considered those contentions of the Arnolds which have not been resolved by our review of the trial court's rationale. The first of these is predicated on Md.Code (1975, 1983 Repl.Vol.), § 15–402(a) and (d) of the Commercial Law Article.[8] The statute is traceable to Ch. 23, § 9 of the Acts of 1763 and is concerned with specialties. *Jackson v. Myers,* 43 Md. 452, 462 (1876). CL § 3–113 provides that "[a]n instrument otherwise negotiable is within this title even though it is under a seal." Accordingly, even assuming the Arnold notes to be specialties, Title 3 of the Maryland U.C.C. governs. CL § 3–301 authorizes a holder to "enforce payment in his own name." No assignment under seal to Ruth was required. There is no

---

7. This conclusion renders unnecessary consideration of Ruth's argument that the Arnold note in the original face amount of $20,000 is not subject to the contract defense in any event.

8. Those subsections of CL § 15–402 read:

 (a) *Action against obligor.*—Subject to the provisions of subsection (d) of this section, the assignee of a bond or other obligation under seal which was assigned under the assignor's signature and seal, may maintain an action in his name against the obligor named in the bond or other obligation.

 . . . .

 (d) *Certification of amount due.*—An action may not be maintained by the assignee against the obligor unless the obligee certifies before a notary public, in writing on the bond or other obligation, that at the time of the assignment the obligor still owed the amount for which the action is filed.

merit to the appellees' contention that the Arnold notes are not negotiable instruments, but are "choses in action" or "contract rights." The instruments are signed by the makers and contain an unconditional promise to pay a sum certain in money at a definite time to the order of the payee. Those are the elements of the § 3–104 definition of a writing which is a negotiable note within Title 3.

Appellees also assert that Ruth cannot sue in her own name as holder of the Arnold notes because, after indorsement by SNB to Ruth, Ruth by a writing separate from the instruments assigned the proceeds of the instruments to SNB. This assignment, however, was for security purposes in the period following the formation of the settlement agreement between SNB and Ruth up to Ruth's full performance of that agreement by payment to SNB out of the proceeds from the sale of the residence. Any secondary security interest, which might have been created by that assignment from Ruth to SNB, was extinguished by Ruth's payment of the balance of the Weast debt. That interim assignment does not affect Ruth's status as a holder of the Arnold notes.

Because there was no sale by SNB of the security for the Weast debt, as explained *supra*, there was no need for SNB to notify George's trustee in bankruptcy of a sale, as the Arnolds contend.

Nor is there merit in the argument that, in applying the shelter doctrine, SNB's status as a holder in due course should be determined as of the time of its transfer to Ruth, so that, even if SNB took as a holder in due course, it no longer had that status when it indorsed to Ruth. Section 3–302(1) specifies the time of taking the instrument as the time for determining holder in due course status. An argument similar to that of appellees was specifically rejected in *Third National Bank v. Hardi-Gardens Supply; Hollemon v. Murray; Schranz v. I.L. Grossman, Inc.*, all *supra*. To hold otherwise would greatly weaken the market for notes taken as a holder in due course which there-

after become due and would undermine the policy of the shelter doctrine.

(7)

Because of our conclusion that the Arnolds are entitled only to nominal damages on the breach of the partial release provision, proceedings on remand in this case will be limited to computing the amount of judgment to be entered in favor of Ruth against Francis and Josephine. Judgment should be entered in the amount of the principal unpaid balance on the Arnold notes, together with interest at the rate specified in those notes to the date of judgment, less $1.00, the nominal damages setoff. *See Asibem Assoc., supra,* 264 Md. 272, 286 A.2d 160.

JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED AND CASE REMANDED FOR THE ENTRY OF JUDGMENT IN FAVOR OF RUTH W. WEAST IN ACCORDANCE WITH THIS OPINION.

COSTS TO BE PAID BY FRANCIS A. ARNOLD AND JOSEPHINE ARNOLD.